James H. Hohenstein
Christopher R. Nolan
K. Blythe Daly
HOLLAND & KNIGHT LLP
195 Broadway
New York, New York 10007-3189
Tel.:   (212) 513-3200
Fax:   (212) 385-9010
E-mail: jim.hohenstein@hklaw.com
        chris.nolan@hklaw.com
        blythe.daly@hklaw.com

Attorneys for Plaintiff,
*Ermis Management Company Limited*



'09 CIV 7452

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ERMIS MANAGEMENT COMPANY
LIMITED,

                    Plaintiff,

- against -

UNITED CALIFORNIA DISCOUNT
CORPORATION D/B/A UNITED NEVADA TRADE
INTERNATIONAL, JOSEPH P. CLARK AND
DAVID B. CLARK,

                    Defendants.

09 CV _____ (___)

**VERIFIED**
**COMPLAINT**

    Plaintiff, Ermis Management Company Limited ("Ermis" or "Plaintiff") by and through

its attorneys, Holland & Knight LLP, for its verified complaint against United California

Discount Corporation d/b/a United Nevada Trade International ("UNTI"), Joseph P. Clark ("J.

Clark") and David B. Clark ("D. Clark") (collectively "Defendants"), alleges as follows:

1.      This is a prejudgment attachment case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1333.

2.      At all times material herein, Plaintiff Ermis was and is a business entity organized under the laws of Malta with a place of business at 171 Old Bakery Street, Valetta, Malta.

3.      At all times material herein, Defendant UNTI was and is a corporation organized under the laws of the State of California with a place of business at 225 Avenue I, Suite 201, Redondo Beach, California 90277.

4.      At all times material herein, Defendant J. Clark was and is a resident of California and may be located at 220 Avenue I, Redondo Beach, California 90277.

5.      At all times material herein, Defendant D. Clark was and is a resident of California and may be located at 220 Avenue I, Redondo Beach, California 90277.

6.      Defendant D. Clark is the 100% sole shareholder and president of Defendant UNTI, and along with J. Clark has served as president of UNTI at various times.

## BACKGROUND

7.      On or about August 9, 1999, Plaintiff, as disponent owner of the M/V TOMIS WEST (the "Vessel"),[1] and Durward Marine LLC ("Durward"), as charterer, entered into a charter party of the Vessel (the "Charter").  A true and correct copy of the  Charter is annexed as Exhibit 1.

8.      Pursuant to the Charter, Durward time chartered the Vessel for an initial three-month period, and, at Durward's option, further chartered the Vessel for an option period of three

---

[1] A disponent owner is the person or company who controls the commercial operation of a vessel.  Very often, the disponent owner is not the registered owner having title to the vessel but a party who has previously chartered the vessel from the registered owner or another charterer. Peter Brodie, DICTIONARY OF SHIPPING (4th ed. 2003). In turn, the disponent owner can then charter (lease) the vessel to another party, i.e., the charterer.

months, and a final option period of six months. Durward's exercise of the options under the Charter extended the charter period up to and including August 16, 2000.

9.      In accordance with the terms of the Charter, Ermis duly delivered the Vessel to Durward in August of 1999. The Vessel thereafter was operated under the Charter until July 12, 2000.

10.     Ermis fully performed all of its obligations with respect to the Charter of the Vessel.

11.     Pursuant to the Charter, Durward traded the Vessel on a world-wide basis, typically by sub-chartering the Vessel to third parties. Prior to July 12, 2000, the Vessel, at the direction of Durward, duly loaded various cargoes for discharge at Point Des Galets, Mumbai, Port Sultan Qaboos, Dubai, and Bandar Iman Khomeini, and Durward was paid the full freight for the carriage of this cargo. Further, the Vessel obtained bunkers for use during the voyage. The bunkers (fuel oil for the Vessel) were supplied for the account of Durward, in accordance with the terms of the Charter.

12.     Pursuant to the terms of the Charter, Durward was to make charter hire payments twice monthly. On or about July 12, 2000, Durward, via Defendant J. Clark, breached the Charter by informing Mr. Thomas Cornwall of Pentland Management Ltd. ("Pentland"), Durward's management agent, that Durward would not pay for the discharge of cargo presently aboard the Vessel, as was its duty under the terms of the Charter, and unequivocally repudiated the Charter. Defendant J. Clark stated, in an email to Cornwall, that Durward "is not capable capable [sic] of making any payments on monies owed now or in the future."

13.     When Mr. Cornwall received this email, he testified in a sworn deposition that his reaction was one of "utter shock." It was clear to him that with the funds received from the sub-

charterers, Durward had sufficient cash to complete the voyage and pay amounts owed to Ermis and the other owed entities, such as the bunker suppliers. Cornwall immediately responded to Durward/J. Clark, by fax dated July 11, 2000 in which he pointedly referred to the fact that Durward had received the Transgrain freight payment and thus "to accept money for services and then to default on that obligation at a time when you knew you could not fulfill the charter, in my opinion, borders on fraud and, indeed, may be fraud." Cornwall fully understood that since the Vessel was laden with cargo, the disponent owner, Ermis, would have to complete the voyage and would be liable for bunkers, port dues and the like.

14.    As set forth below, the reason Durward had misrepresented that it had no "capability" to pay was due to the fact that the money it had received from the sub-charterers for this specific voyage was instead paid to Durward's *alter ego*, Defendant UNTI, at the direction and knowledge of both Defendants J. Clark and D. Clark.

## PLAINTIFF'S CLAIM AGAINST DEFENDANTS BASED ON *ALTER-EGO* LIABILITY

15.    UNTI, J. Clark and P. Clark are *alter-egos* of Durward because Defendants dominated and disregarded Durward's corporate form to the extent that Defendants were actually carrying on Durward's business and operations as if the same were their own or vice-versa.

16.    On August 1, 2007, Plaintiff filed a Complaint in the District of Nevada (the "Nevada Action") against the Defendants in this Supplemental Rule B action seeking to pierce the corporate veil of the Defendants in order to enforce a Nevada judgment issued against Durward (the "Nevada Complaint"). The Nevada Complaint more fully describes the *alter ego* allegations in paragraphs 26-62; based on evidence diligently compiled by Ermis. A true and correct copy of the Nevada Complaint is annexed as Exhibit 2.

17.    To ease the burden on this Court, Ermis will not repeat the details of each and every allegation, especially because the Honorable Philip M. Pro, United States District Judge, District of Nevada, has recently issued an Order denying Defendants' motion for summary judgment against Ermis on *alter ego* grounds, among other arguments.  A true and correct copy of the August 3, 2009 Order is annexed as Exhibit 3.  Judge Pro specifically addressed the applicable maritime *alter ego* factors (relying on federal maritime law from this Honorable District, as well as others) and the evidence submitted by both parties, finding a genuine issue of material fact exists to be resolved at trial.  *See* pp. 12-17.  Therefore, Ermis' *alter ego* allegations meet (and exceed) the *prima facie* or reasonable grounds test for sufficiency of maritime claim allegations.  *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434 (2d Cir. 2006) (establishing the plaintiff's burden for alleging a *prima facie* maritime claim under Supplemental Rule B); *Glory Wealth Shipping Serv. Ltd. v. Five Ocean Corp.*, No. 08 Civ. 1102, 2008 WL 3166680, at *2-3 (S.D.N.Y. Aug. 4, 2008) (collecting cases assessing both the *prima facie* and reasonable grounds standards and ultimately joining the majority of courts in employing the *prima facie* standard).

18.    The key alter ego allegations, all of which were supported with citations to evidence in the record in opposition to the Defendants' motion for summary judgment, are as follows:

(a)    common ownership (Durward and UNTI stock ownership and "economic benefits of ownership" accruing to the Clarks);

(b)    common directors and officers (the Clarks holding UNTI/Durward positions of authority and made key decisions;  with friends in positions in name only on filings);

(c)    use of same corporate office (for UNTI, the Clarks, and Durward);

5

(d)    inadequate capitalization of shell (woefully low initial contribution on paper by Clarks of $12,000 [and no proof the $12,000 was even made] compared to what was necessary, $350,000 and "loans" disguised as equity);

(e)    financing of shell entity by *alter egos* (all operating funds for Durward through UNTI, worthless personal guarantees of J. Clark never called on);

(f)    *alter egos'* use of shell company's property and assets as its own (use of Durward monies for stock market speculation, pulling monies to support UNTI, finding priority in getting UNTI money as opposed to more cash for Durward on a more extended time period);

(g)    informal corporate loan transactions (loan documents by UNTI are self-serving, proof of transactions without documentation);

(h)    shell and *alter ego* joint tax returns (Durward and J. Clark shared tax preparer, J. Clark listed on Durward returns; joint financial statements and outlooks);

(i)    decision-making for shell company by *alter egos* (J. Clark handled Durward checks and banking when not member, J. Clark made UNTI-centric decisions for Durward, Clarks jointly decided to pull plug on Durward for UNTI's sake);

(j)    shell company's directors acted in favor of *alter egos* (J. Clark admits loyalty to UNTI key ceasing of funding and breaching of charter decision by both Clarks for UNTI's benefit to stop claimed UNTI losses);

(k)    contracts between *alter egos* and shell are more favorable to *alter egos* (UNTI contracts so self-serving UNTI has authority over "client's" bank account, steep interest on advancements make Durward profit hard when J. Clark uses Durward funds to pay personal debts, bogus written authority under financing agreement to strip Durward of funds at UNTI's decision and behest, with aid of J. Clark and UNTI's employee, Rowena Sia);

(l)    non-observance of legal formalities (Defendants admit no Durward capital accounts opened, admit "perhaps" two Durward annual meetings, Clarks admit no documents for purported transfer to Durward interest to others, cannot "recall" Durward board meeting two weeks before July 11 breach email, and no UNTI minutes of corporate meetings which address Durward whatsoever); and

(m)    fraud, wrongdoing and injustice to third-parties (Clarks knew monies were owed to third-party suppliers of Durward for final voyage, had enough money from sub-charterer hire, and breached anyway committing what Cornwall said "may be fraud" in a fax to Durward/the Clarks the day of the breach, July 11, 2000).

19.    It is not general practice in the maritime community, nor anywhere else, for supposedly independent companies such as UNTI and Durward to freely transfer funds between one another, to share corporate officers and employees, to allow other companies to enter into credit arrangements or pay invoices on their behalf.

20.    Because of the actions of and relationships among the Defendants recited above, Defendants are liable to Ermis as *alter-egos* and/or corporate arms of Durward.

## ARBITRATION AND CONFIRMATION

21.    In accordance with the terms of the Charter, Ermis demanded arbitration of the dispute with Durward in London. An arbitrator was appointed and the arbitration proceedings were conducted. Despite notification and the opportunity to be heard at all relevant times, to the Clarks and otherwise, Durward chose not to participate.

22.    On April 30, 2002, the arbitrator rendered the Final Arbitration Award and Reasons for Final Arbitration Award, awarding Ermis $682,654.36 in principal amount, as well as interest, cost and attorneys' fees arising from the arbitration (collectively the "London Award"). A true and correct copy of the London Award is annexed as Exhibit 4.

23.    Following issuance of the London Award, Durward failed to make payment or to respond to demand for payment.

24.    Due to Durward's non-responsiveness, on October 15, 2002, Ermis filed a Notice of Petition and Petition to Confirm the Arbitration Award in the District Court of Nevada, the state where Durward was duly organized and existing.

25.    On December 3, 2002, the Honorable Kent Dawson, United States District Judge, District of Nevada, signed an order confirming the London Award and finding the Plaintiff was

also entitled to recover its attorneys' fees related to the confirmation proceedings. A true and correct copy of the Order ("Nevada Order") is annexed as Exhibit 5.

26.     On December 3, 2002, Judge Dawson also signed a judgment in favor of Ermis against Durward in the amount of $784,226.10, in addition to post-judgment interest. A true and correct copy of the Judgment ("Nevada Judgment") is annexed as Exhibit 6. As noted therein, the Nevada Judgment was entered on December 5, 2002.

27.     On April 30, 2003, Plaintiff registered the Nevada Judgment in the District Court for the Central District of California.

28.     Thereafter, Plaintiff attempted to collect pursuant to the Nevada Judgment, but could not enforce the judgment because Durward was insolvent due to the acts of the Defendants, the *alter-egos* of Durward, as outlined above.

29.     Between 2003 and 2004, Ermis undertook discovery efforts to enforce the Nevada Judgment including document subpoenas directed to the Clarks and UNTI.

30.     Between 2005 and 2007, Ermis drafted a complaint, transmitted it to Defendants' counsel, entertained unsuccessful mediation discussions, and retained a forensic accountant for *alter ego* analysis, analyzed the report, and subsequently filed suit in California, and ultimately Nevada (before the Hon. Philip M. Pro, still presiding), as discussed above. The Nevada Action remains pending.

## DAMAGES SOUGHT

31.     Plaintiff seeks prejudgment attachment against the Defendants as security for the Nevada Action.

32.     As noted above, the Nevada Judgment is in principal amount $784,226.10. Post-judgment interest is based upon the weekly average 1-year constant maturity treasury yield for

the week preceding the entry of judgment. 28 U.S.C. §1961(a). The interest is compounded annually. 28 U.S.C. §1961(b). For the week preceding December 5, 2002, the rate was 1.55%. It is estimated that the Nevada Action will be concluded during the upcoming year and thus the interest has been calculated to March 31, 2010. The amount of such interest is $93,561.73, for a total claim of $877,787.83.

33.    During the pendency of the matter, Ermis was able to recover certain funds by way of the exercise of its maritime lien rights under the terms of the charter as well as funds garnished by Plaintiff. The total principal amount of such recoveries was $55,463.45. To this amount must be applied a credit for post-judgment interest, which is in the amount of $6,617.04, for a total of $62,080.49.

34.    Thus, Plaintiff's claim for principal and interest is $815,707.34.

35.    Further, the London Award, the Nevada Order and Nevada Judgment held Ermis was entitled to attorneys' fees and disbursements. The Nevada Order specifically held that Ermis could recover attorneys' fees and disbursements related to enforcement of the Award: "As the underlying contract is governed by English law, such fees and disbursements are recoverable. *See De Roburt v. Gannet Co. Inc.*, 558 F. Supp. 1223, 1228 (D. Hawaii 1983), *rev'd on other grounds*, 733 F.2d 710 (9th Cir. 1984), *cert. denied*, 469 U.S. 1159 (1985)." Nevada Order at 3. To date, $885,126.55 in attorneys' fees, expert fees, and associated disbursements in connection with this action have been incurred and paid.[2]

---

[2] In addition to attorneys' fees being recoverable under English law, in accordance with Nevada Order and Judgment, attorneys' fees are also recoverable under U.S. law. *See Rhonda Enterprises S.A. v. Projector S.A.*, No. 08 Civ. 9563, 2009 WL 290537 (S.D.N.Y. Feb. 6, 2009), (invoking "equitable powers" to award attorney's fees for petition to confirm an arbitration award); *see also Int'l Chemical Workers Union (AFL-CIO), Local No. 227 v. BASF Wyandotte Corp.*, 774 F.2d 43 (2d Cir. 1985) (reasoning "Pursuant to its inherent equitable powers, however, a court may award attorney's fees when the opposing counsel acts 'in bad faith, vexatiously, wantonly, or for oppressive reasons.' As applied to suits for the confirmation and enforcement of arbitration awards, the guiding principle has been stated as follows: 'when a challenger refuses to abide by an arbitrator's decision without justification, attorney's fees and costs may properly be awarded.") (internal citations omitted).

36.    Ermis' claim herein can thus be summarized as follows:

| | |
|---|---|
| Principal and Interest | $  815,707.34 |
| Attorneys' Fees and Disbursements | $  879,429.90[3] |
| **TOTAL CLAIM** | **$1,695,137.24** |

37.    Upon information and belief, information and belief, Defendants UNTI, J. Clark and D. Clark regularly conduct business with foreign entities.    When foreign entities send payments to the Defendants, these payment are made in U.S. Dollars and *vice versa*.

38.    Electronic fund transfers in U.S. Dollars from or to foreign entities regularly pass through intermediary banks in New York.    UNTI has described itself as in the business of purchase order financing and import/export financing.    As such, it often enters into import/export finance and security agreements, as it did with Durward.    UNTI has further described the import/export agreement as covering "services offered to those clients involved in the importing and exporting of goods overseas; these clients, in turn, would require letters of credit in conjunction with UNTI's purchase order financing services."    Thus, it is expected UNTI will have assets to and from foreign countries using intermediary banks in this Honorable District.

## REQUEST FOR ATTACHMENT

39.    Defendants United California Discount Corporation d/b/a United Nevada Trade International, Joseph P. Clark and David B. Clark are not found within the Southern District of New York, but they do transact business in U.S. Dollars.    Hence, the Defendants have, or will have during the pendency of this proceeding, assets, goods, chattels, credits, letters of credit, bills of lading, debts, effects and monies, funds, credits, wire transfers, accounts, letters of credit, electronic fund transfers, freights, sub-freights, charter hire, sub-charter hire, or other tangible or intangible which belongs to them, is claimed by them, is being held for them or on their behalf,

---

[3] The Nevada Judgment included $5,696.65 in attorneys' fees and costs and thus that amount has been deducted from this figure.

or which is being transferred for the benefit of the Defendant, within the jurisdiction and held in the names of United California Discount Corporation d/b/a United Nevada Trade International, Joseph P. Clark and David B. Clark with, upon information and belief, the following financial institutions:  ABN Amro Bank; American Express Bank; Banco Popular; Bank of America, N.A.; Bank of China; Bank Leumi USA; The Bank of New York; Bank of Tokyo-Mitsubishi UFJ Ltd.; BNP Paribas; Calyon Investment Bank; Citibank, N.A.; Commerzbank; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; Standard Chartered Bank; Société Générale; UBS AG; Wachovia Bank, N.A.; or any other financial institution within the Southern District of New York.

WHEREFORE, plaintiff Ermis Management Company Limited prays:

1.    That a summons with process of prejudgment attachment and garnishment may issue against the Defendants United California Discount Corporation d/b/a United Nevada Trade International, Joseph P. Clark and David B. Clark, in the amount of $1,695,137.24 (including estimated interest, costs and attorney's fees), and if Defendants United California Discount Corporation d/b/a United Nevada Trade International, Joseph P. Clark and David B. Clark cannot be found, then that their goods, chattels, credits, letters of credit, bills of lading, debts, effects and monies, funds, credits, wire transfers, accounts, letters of credit, electronic fund transfers, freights, sub-freights, charter hire, sub-charter hire, or other tangible or intangible property which belongs to them, is claimed by them, is being held for them or on their behalf, or which is being transferred for their benefit, within the district may be attached in an amount sufficient to answer Ermis' claim;

2.      That Defendants United California Discount Corporation d/b/a United Nevada Trade International, Joseph P. Clark and David B. Clark, and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.      That judgment be entered in favor of Ermis Management Company Limited and against Defendants United California Discount Corporation d/b/a United Nevada Trade International, Joseph P. Clark and David B. Clark in the amount of $1,695,137.24 (including estimated interest, attorneys' fees and costs); and,

4.      That this Court grant Ermis Management Company Limited such other and further relief which it may deem just and proper.

Dated: New York, New York
        August 2/, 2009

                            HOLLAND & KNIGHT LLP

                    By:     _____
                            James H. Hohenstein
                            Christopher R. Nolan
                            K. Blythe Daly
                            HOLLAND & KNIGHT LLP
                            195 Broadway
                            New York, New York  10007-3189
                            Tel.:   (212) 513-3200
                            Fax:    (212) 385-9010
                            E-mail: jim.hohenstein@hklaw.com
                                    chris.nolan@hklaw.com
                                    blythe.daly@hklaw.com

                            Attorneys for Plaintiff,
                            *Ermis Management Company Limited*

## VERIFICATION

STATE OF NEW YORK          )

                                                   :ss.:

COUNTY OF NEW YORK      )

      James H. Hohenstein, being duly sworn, deposes and says:

      I am a member of the firm of Holland & Knight LLP, counsel for Ermis Management Company Limited ("Ermis"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Ermis' representatives and corresponded with Ermis' representatives regarding this matter. I am authorized by Ermis to make this verification, and the reason for my making it as opposed to an officer or director of Ermis is that there are none within the jurisdiction of this Honorable Court.

                                    James H. Hohenstein

Sworn to before me this
24th day of August, 2009

Notary Public

# 8780770_v1

DIALYZ E. MORALES
Notary Public, State Of New York
No. 01MO6059215
Qualified In New York County
Commission Expires June 25, 20__

13

# EXHIBIT 1

Code word for this Charter Party
"SHELLTIME 4"



# ORIGINAL

### Time Charter Party

LONDON. 9.8.    19 99

IT IS THIS DAY AGREED between    ERMIS MANAGEMENT COMPANY.LIMITED.

of VALETTA, MALTA.    (hereinafter referred to as "Owners"). being owners of the

good Motor    vessel called    "TOMIS WEST" – Bahamas flag, built 1990,

(hereinafter referred to as "the vessel") described as per Clause 1 hereof and DURWARD MARINE.

of    U.S.A.,    (hereinafter referred to as "Charterers"):

| | |
|---|---|
| **Description and Condition of Vessel** | 1.    At the date of delivery of the vessel under this charter<br>(a)   she shall be classed:  Det Norske Veritas<br>(b)   she shall be in every way fit to carry crude petroleum and/or its products  See Clause 4. |
| | (c)   she shall be tight, staunch, strong, in good order and condition, and in every way fit for the service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator and radar) in a good and efficient state;<br>(d)   her tanks, valves and pipelines shall be oiltight;<br>(e)   she shall be in every way fitted for burning |
| | at sea – fuel oil with a maximum viscosity of  180   Centistokes at 50 degrees Centigrade ~~or marine diesel oil~~<br>~~commercial grade of fueloil~~ ~~ACGFO~~ ) for main propulsion, ~~marine diesel oil/CGFO~~<br>for auxiliaries    MGO(DMA)<br>in port – marine diesel oil/~~ACGFO~~ for auxiliaries: |
| | (f)   she shall comply with the regulations in force so as to enable her to pass through the Suez and Panama Canals by day and night without delay;<br>(g)   she shall have on board all certificates, documents and equipment required from time to time by any applicable law to enable her to perform the charter service without delay;<br>(h)   she shall comply with the description in Form B appended hereto, provided however that if there is any conflict between the provisions of Form B and any other provision, including this Clause 1, of this charter such other provision shall govern. |
| **Shipboard Personnel and their Duties** | 2.    (a)   At the date of delivery of the vessel under this charter<br>(i)   she shall have a full and efficient complement of master, officers and crew for a vessel of her tonnage, who shall in any event be not less than the number required by the law of the flag state and who shall be trained to operate the vessel and her equipment competently and safely;<br>(ii)   all shipboard personnel shall hold valid certificates of competence in accordance with the requirements of the law of the flag state;<br>(iii)   all shipboard personnel shall be trained in accordance with the relevant provisions of the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978.<br>(iv)   there shall be on board sufficient personnel with a good working knowledge of the English language to enable cargo operations at loading and discharging places to be carried out efficiently and safely, and to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be carried out quickly and efficiently.<br>(b)   Owners guarantee that throughout the charter service the master shall with the vessel's officers and crew, unless otherwise ordered by Charterers,<br>(i)   prosecute all voyages with the utmost despatch;<br>(ii)   render all customary assistance; and<br>(iii)   load and discharge cargo as rapidly as possible when required by Charterers or their agents to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the case may be) and in each case in accordance with any applicable laws of the flag state. |
| **Duty to Maintain** | 3.    (i)   Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.<br>(ii)   If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the requirements of Clause 1, 2(a) or 10 then hire shall be reduced to the extent ~~necessary to indemnify Charterers~~ ~~for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services~~ ~~under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time~~ ~~so lost.~~ |
| | Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded from any calculation under Clause 24.<br>(iii)   If Owners are in breach of their obligation under Clause 3(i) Charterers may so notify Owners in writing; and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(i), the vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they are exercising such due diligence.   for more than 15 consecutive days<br>Furthermore, at any time while the vessel is off-hire under this Clause 3 Charterers have the option to terminate this charter by giving notice in writing with effect from the date on which such notice of termination is received by Owners or from any later date stated in such notice. This sub-Clause (iii) is without prejudice to any rights of Charterers or obligations of Owners under this charter or otherwise (including without limitation Charterers' rights under Clause 21 hereof). |

Any reduction in hire only to be made after presentation to Owens of Charterers documented claim and their approval (or prejudice) thereof.

2

minimum 3 months Time Charter, Charterer's option further 3, option 3 months. Each period declarable 15 days in advance (plus/minus 20 days last period),

**Period Trading Limits**

**(See Additional Clause 46, as attached).**

4.   Owners agree to let and Charterers agree to hire the vessel for a period of / commencing from the time and date of delivery of the vessel, for the purpose of carrying all lawful merchandise (subject always to Clause 2A) including in particular one/for grade(s) Clean Petroleum Products Unleaded (Unleaded charker 2.5 NPA excluding Lubes/Gasin/road/Solvents/Chemicals/Alcohol or one/for grade(s), to heat Vegoil including derivatives subject to manufacturers coating specification.

~~in any part of the world as Charterers shall direct, subject to the limits of the current Broads Institute Warranties and any subsequent amendment thereof. Notwithstanding the foregoing, but subject to Client 34, Charterers may order the vessel to ice bound waters or to any part of the world outside such limits provided that Owners consent thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance premiums required by the vessel's underwriters as consequence of such order.~~

Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places (which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always afloat. Notwithstanding anything contained in this or any other clause of this charter, Charterers do not warrant the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for loss or damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be loaded and discharged at any places as Charterers may direct, provided that Charterers shall exercise due diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition of the ICS/OCIMF Ship-to-Ship Transfer Guide.

The vessel shall be delivered by Owners ~~at port on~~ arrival pilot station one safe port Caribbean excluding Like MЮ/road/Graphito but including Trinidad at Owners' option and redelivered to Owners ~~at port~~ in dropping last outward sea pilot one safe port U.K. Convent or Mediterranean or Caribbean or U.S. Gulf or U.S. Atlantic Coast or Whole East Gulf including India at Charterers' option.

**Laydays/ Cancelling**

5.   The vessel shall not be delivered to Charterers before 10th August, 1999 and Charterers shall have the option of cancelling this charter if the vessel is not ready and at their disposal on or before 20th August, 1999.

**Owners to Provide**

6.   Owners undertake to provide and to pay for all provisions, wages, and shipping and discharging fees and all other expenses of the master, officers and crew; also, except as provided in Clauses 4 and 34 hereof, for all insurance on the vessel, for all deck, cabin and engine-room stores, and for water; for all drydocking, overhaul, maintenance and repairs to the vessel; and for all fumigation expenses and dental certificates. Owners' obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the performance of this charter in relation to the personal effects of the master, officers and crew, and in relation to the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall refund to Charterers any sums Charterers or their agent may have paid or been compelled to pay in respect of any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire.

**Charterers to Provide**

7.   Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage and pilotage and shall pay agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for Owners' purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or distance made good and taken into account under Clause 21 or 221c and provided further that any fuel used in connection with a general average sacrifice or expenditure shall be paid for by Owners.

**Rate of Hire**

8.   Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of $_____ per day, and pro rata for any part of a day, from the time and date of her delivery (local time) until the time and date of her redelivery (local time) to Owners.

**Payment of Hire**

9.   Subject to Clause 3 (iii), payment of hire shall be made in immediately available funds to: National Westminster Bank Plc., 46 High Street, Brentwood, Essex, CM6 4PL, Sort Code 60 03 25, for credit of ESSEX SHIPPING SERVICES LIMITED, U.S. Dollar Deposit Account No. 02677822.

in _____ per calendar month in advance, less:

(i)   any hire paid which Charterers reasonably estimate to relate to off-hire periods, and

(ii)   any amounts disbursed on Owners' behalf, any advances and commission thereon, and charges which are for Owners' account pursuant to any provision hereof, and

(iii)   ~~any amount that are reasonably estimated to become due to Charterers under Clause 3 (ii) or 24 hereof.~~

any such adjustments to be made at the due date for the next monthly payment after the facts have been ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners' account provided that Charterers have made proper and timely payment.

In default of such proper and timely payment,

(a)   Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of such notice pay to Owners the amount due including interest, failing which Owners may withdraw the vessel from the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise; and

(b)   Interest on any amount due but not paid on the due date, shall accrue from the day after that date up to and including the day when payment is made, at a rate per annum which shall be 1% above the U.S. Prime Interest Rate as published by the Chase Manhattan Bank in New York at 12.00 New York time on the due date, or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months, compounded semi-annually.

US$9,000.00 first 3 months
US$9,000.00 second period

3

| | |
|---|---|
| Space Available to Charterers | 10.   The whole reach, burthen and decks of the vessel and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed ~~300~~ 600  tonnes at any time during the charter period. |
| Overtime | 11.   Overtime pay of the master, officers and crew in accordance with ship's articles shall be for Charterers' account when incurred, as a result of complying with the request of Charterers or their agents, for loading, discharging, heating of cargo, bunkering or tank cleaning. |
| Instructions and Logs | 12.   Charterers shall from time to time give the master all requisite instructions and sailing directions, and he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require; Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master. |
| Bills of Lading | 13.   (a)   The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as Charterers or their agents may direct (subject always to Clauses 35(a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise<br>  (i)   from signing bills of lading in accordance with the directions of Charterers or their agents, to the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 13(b)) from the master otherwise complying with Charterers' or their agents' orders;<br>  (ii)   from any irregularities in papers supplied by Charterers or their agents.<br>  (b)   Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from Charterers to discharge all or part of the cargo<br>  (i)   at any place other than that shown on the bill of lading and/or<br>  (ii)   without presentation of an original bill of lading<br>  unless they have received from Charterers both written confirmation of such orders and an indemnity in a form acceptable to Owners. |
| Conduct of Vessel's Personnel | 14.   If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible. |
| Bunkers at Delivery and Redelivery | 15.   Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on redelivery (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the then-current market prices at the port of delivery or redelivery, as the case may be, or if such prices are not available payment shall be at the then-current market prices at the nearest port at which such prices are available; provided that if delivery or redelivery does not take place in a port payment shall be at the price paid at the vessel's last port of bunkering before delivery or redelivery, as the case may be. Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time to time, if so required by Charterers, provided suppliers agree. |
| Stevedores, Pilots, Tugs | 16.   Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company); provided, however, that<br>  (i)   the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and<br>  (ii)   Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores.<br>MAXIMUM: £50 |
| Supernumeraries | 17.   Charterers may send representatives in the vessel's available accommodation upon any voyage made under this charter. Owners finding provisions and all requisites as supplied to officers, except liquors, Charterers paying at the rate of      per day for each representative while on board the vessel. |
| Sub-letting | 18.   Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this charter. |
| Final Voyage | 19.   If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct amounts due or reasonably expected to become due for<br>  (i)   disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and<br>  (ii)   bunkers on board at redelivery pursuant to Clause 15.<br>Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by Charterers.<br>If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a ballast voyage to a port of redelivery or upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be. |

Stores 100/300 MT
Fresh water capacity is 300 MT

Loss of
Vessel

20.  Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss: should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this charter shall terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port.

198
199
200
201
202
203
204

Off-hire

21.  (a)  On each and every occasion that there is loss of time (whether by way of interruption in the vessel's service or, from reduction in the vessel's performance, or in any other manner)
   (i)  due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the vessel; and such time continues for more than three consecutive hours (if resulting from interruption in the vessel's service) or cumulates to more than three hours (if resulting from partial loss of service); or
   (ii)  due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew; or
   (iii)  for the purpose of obtaining medical advice or treatment for or landing any sick or injured person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body of any person (other than a Charterers' representative), and such loss continues for more than three consecutive hours; or
   (iv)  due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers, or crew; or
   (v)  due to detention of the vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or neglect of Charterers); then
   without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder or otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.
   (b)  If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire under this Clause 21 shall be the difference between
      (i)  the time the vessel would have required to perform the relevant service at such guaranteed speed, and
      (ii)  the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service).
   For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 24.
   (c)  Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which the deviation commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and payable during any time lost thereby.
   (d)  If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof then from the date of receipt by Owners of such notice until the termination of such commercial impracticability the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account.
   (e)  Time during which the vessel is off-hire under this charter shall count as part of the charter period.

205
206
207
208
209
210
211
212
213
214
215
216
217
218
219
220
221
222
223
224
225
226
227
228
229
230
231
232
233
234
235
236
237
238
239
240
241
242
243
244
245
246
247
248
249
250
251
252
253
254
255
256

Periodical
Drydocking

Vessel not to drydock during period except for emergency reasons only.

22.  (a)  Owners have the right and obligation to drydock the vessel at regular intervals of
   On each occasion Owners shall propose to Charterers a date on which they wish to drydock the vessel, not less than          before such date, and Charterers shall offer a port for such periodical drydocking and shall take all reasonable steps to make the vessel available as near to such date as practicable.
   Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any bill of lading or this charter.
   (b)  If a periodical drydocking is carried out in the port offered by Charterers (which must have suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to resume Charterers' service and is at the position at which she went off-hire or a position no less favourable to Charterers, whichever she first attains. However,
      (i)  provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21) and

257
258
259
260
261
262
263
264
265
266
267
268
269
270
271
272
273
274

5

| | |
|---|---|
| (iii) one additional time lost in further gas-freeing to meet the standard required for her work at entry in cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there. | 275 |
| | 276 |
| Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any calculation under Clause 24. | 277 |
| | 27A |
| The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for Owners' account. | 279 |
| | 280 |
| (c) If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to proceed to the special port until she next presents for loading in accordance with Charterers' instructions, provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any benefit they may gain in purchasing bunkers at the special port. | 281 |
| | 282 |
| | 283 |
| | 2A4 |
| | 285 |
| | 286 |
| | 287 |
| | 2A8 |
| (d) Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of tank cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port. | 289 |
| | 290 |
| | 291 |

| Ship Inspection | 23. Charterers shall have the right at any time during the charter period to make such inspection of the vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all necessary co-operation and accommodation on board provided, however, | 292 293 294 295 |
|---|---|---|
| | (i) that neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase Charterers' responsibilities to Owners or third parties for the same; and | 296 297 298 299 |
| | (ii) that Charterers shall not be liable for any act, neglect or default by themselves, their servants or agents in the exercise or non-exercise of the aforesaid right. | 300 301 |

| Detailed Description and Performance | 24. (a) Owners guarantee that the speed and consumption of the vessel shall be as follows : | 302 |
|---|---|---|

| Average speed in knots | Maximum average bunker consumption main propulsion - auxiliaries | | |
|---|---|---|---|
| | fuel oil-diesel oil tonnes | fuel oil-diesel oil tonnes | 303 304 305 |
| Laden | | | 306 |
| 12 | 26 | 2.5 | |

| | | | |
|---|---|---|---|
| Ballast | | | 307 |
| 12.5 | 26 | 2.5 | |

```
Discharging   16 MT Gasoil + 1.0 MT Fuel per normal operation
Loading        9 MT Gasoil + 1.0 MT Fuel per operation
Manoeuvering 0.5 MT Fuel Oil + 0.5 MT Gasoil per hour
Tank cleaning  8 MT Gasoil
Standby       0.5 MT Fuel Oil + 2.5 MT Gasoil per day
Inerting/de-inerting 7.0 Fuel inerting/10 MT Fuel de-inerting
All 24 hours unless stated
```

| | |
|---|---|
| The foregoing bunker consumptions are for all purposes except cargo heating and tank cleaning and shall be pro-rated between the speeds shown. | 308 309 |
| The service speed of the vessel is 12 knots laden and 12.5 knots in ballast and in the absence of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to steam at any speed within the range set out in the table (the "ordered speed"). | 310 311 312 313 |
| If the vessel is ordered to proceed at any speed other than the highest speed shown in the table, and the average speed actually attained by the vessel during the currency of such order exceeds such ordered speed plus 0.5 knots (the "maximum recognised speed"), then for the purpose of calculating any increase or decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed actually attained. | 314 315 316 317 318 |
| For the purposes of this charter the "guaranteed speed" at any time shall be the then-current ordered speed or the service speed, as the case may be | 319 320 |
| The average speeds and bunker consumptions shall for the purposes of this Clause 24 be calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each period stipulated in Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22 (b) (i) would be) off-hire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction of speed is necessary for safety in congested waters or in poor visibility (ii) any days, noon to noon, when winds exceed force 8 on the Beaufort Scale for more than 12 hours. | 321 322 323 324 325 326 |

Winds and Douglas scale sea swell 3.3. For propulsion purposes only. Basis sea .... to see how excluding passage in fog or restricted/congested waters.

6

See Additional Clause 44, as attached.

(b) If during any year from the date on which the vessel enters service (anniversary to anniversary) the vessel falls below or exceeds the performance guaranteed in Clause 24(a) then if such shortfall or excess results |327-328-329

(i) from a reduction or an increase in the average speed of the vessel, compared to the speed guaranteed in Clause 24(a), then an amount equal to the value at the hire rate of the time so lost or gained, as the case may be, shall be deducted from or added to the hire paid. |330-331-332

(ii) from an increase or a decrease in the total bunkers consumed, compared to the total bunkers which would have been consumed had the vessel performed as guaranteed in Clause 24(a), an amount equal either to the value of the additional bunkers consumed or the bunkers saved, as the case may be, based on the average price paid by Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid. |333-334-335-336

The addition to or deduction from hire so calculated for laden and ballast mileage respectively shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather Periods, by dividing such addition or deduction by the number of miles over which the performance has been calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather Periods, in order to establish the total addition to or deduction from hire to be made for such period. |337-338-339-340-341

Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other remedy available to Charterers. |342-343

(c) Calculations under this Clause 24 shall be made for the yearly periods terminating on each successive anniversary of the date on which the vessel enters service, and for the period between the last such anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of hire arising under this Clause during the final year or part year of the charter period shall in the first instance be settled in accordance with Charterers' estimate made two months before the end of the charter period. Any necessary adjustment after this charter terminates shall be made by payment by Owners to Charterers or by Charterers to Owners as the case may require. |344-345-346-347-348-349-350

Payments in respect of increase of hire arising under this Clause shall be made promptly after receipt by Charterers of all the information necessary to calculate such increase. |351-352

Salvage    25. Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of services rendered under this Clause. |353-354-355-356-357

All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers after deducting the master's, officers' and crew's share. |358-359

or sub-hires

Lien    26. Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts due under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not earned, and for all claims for damages arising from any breach by Owners of this charter. |360-361-362

Exceptions    27. (a) The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, mariners or other servants of Owners in the navigation or management of the vessel, fire, unless caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion; bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however, that Clauses 1, 2, 3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotion or arrest or restraint of princes, rulers or people. |363-364-365-366-367-368-369-370-371-372

(b) The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress and to deviate for the purpose of saving life or property. |373-374

(c) Clause 27(a) shall not apply to or affect any liability of Owners or the vessel or any other relevant person in respect of |375-376

(i) loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, whether or not such works or equipment belong to Charterers, or |377-378-379

(ii) any claim (whether brought by Charterers or any other person) arising out of any loss of or damage to or in connection with cargo. All such claims shall be subject to the Hague-Visby Rules or the Hague Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant bill of lading (whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the Hague-Visby Rules. |380-381-382-383-384

(d) In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire. |385-386

Injurious    28. No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the
Cargoes    foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments. |387-388-389-390

Charterers to supply bunker grades as given.

Grade of    29. Charterers shall supply marine diesel oil/fuel oil with a maximum viscosity of ——— Centistoke or ——
Bunkers    degrees Centigrade/MCGFO for main propulsion and diesel oil/MCGFO for the auxiliaries. If Owners require the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof. |391-392-393

Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality complying with the International Marine Bunker Supply Terms and Conditions of Shell International Trading Company and with a specification for marine fuels as amended from time to time. |394-395-396

Disbursement    30. Should the master require advances for ordinary disbursements in any port, Charterers or their agents shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per cent, and all such advances and commission shall be deducted from hire. |397-398-399

| | |
|---|---|
| Laying-up | 31.  Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should reasonably be made by Owners as a result of such lay-up. Charterers may exercise the said option any number of times during the charter period. |
| Requisition | 32.  Should the vessel be requisitioned by any government, de facto or de jure, during the period of this charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such government in respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of the charter period. |
| Outbreak of War | 33.  If war or hostilities break out between any two or more of the following countries: U.S.A., U.S.S.R., P.R.C., U.K., Netherlands-both Owners and Charterers shall have the right to cancel this charter. |
| Additional War Expenses | *after Owners have given their consent*<br>34.  If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of such expenses as soon as practicable and in any event before such expenses are incurred, and provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under their war risk insurance arising out of compliance with such orders. |
| War Risks | 35.  (a)  The master shall not be required or bound to sign bills of lading for any place which in his or Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, war, hostilities, warlike operations, civil war, civil commotions or revolutions.<br>      (b)  If in the reasonable opinion of the master or Owners it becomes  for any of the reasons set out in Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter (a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or discharged, as the case may be, at any other place within the trading limits of this charter (provided such other place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter in so far as cargo so discharged is concerned.<br>      (c)  The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever given by the government of the state under whose flag the vessel sails or any other government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or is not done, such shall not be deemed a deviation.<br>      If by reason of or in compliance with any such direction or recommendation the vessel does not proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter in so far as cargo so discharged is concerned.<br>      Charterers shall procure that all bills of lading issued under this charter shall contain the Chamber of Shipping War Risks Clause 1952. |
| Both to Blame Collision Clause | 36.  If the liability for any collision in which the vessel is involved while performing this charter falls to be determined in accordance with the laws of the United States of America, the following provision shall apply:<br>      "If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier."<br>      "The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact."<br>      Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be determined in accordance with the laws of the United States of America. |
| New Jason Clause | *as amended 1990*<br>37.  General average contributions shall be payable according to the York/Antwerp Rules, 1974, and shall be adjusted in London in accordance with English law and practice but should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:<br>      "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo."<br>      "If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover |

the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by   473
the cargo, shippers, consignees or owners of the cargo to the carrier before delivery."   474
    Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the   475
foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and   476
practice of the United States of America.   477

<table>
<tr><td>Clause<br>Paramount</td><td>38.  Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the<br>following clause:</td><td>478<br>479</td></tr>
</table>

    "(1) Subject to sub-clause (2) hereof, this bill of lading shall be governed by, and have effect subject   480
to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of   481
Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed   482
at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be   483
deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his   484
responsibilities or liabilities under the Hague-Visby Rules."   485
    "(2) If there is governing legislation which applies the Hague Rules compulsorily to this bill of lading,   486
to the exclusion of the Hague-Visby Rules, then this bill of lading shall have effect subject to the Hague Rules.   487
Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities   488
or an increase of any of his responsibilities or liabilities under the Hague Rules."   489
    "(3) If any term of this bill of lading is repugnant to the Hague-Visby Rules, or Hague Rules if   490
applicable, such term shall be void to that extent but no further."   491
    "(4) Nothing in this bill of lading shall be construed as in any way restricting, excluding or waiving the   492
right of any relevant party or person to limit his liability under any available legislation and/or law."   493

<table>
<tr><td>TOVALOP</td><td>39.  Owners warrant that the vessel is:</td><td>494<br>495</td></tr>
<tr><td></td><td>    (i)  a tanker in TOVALOP and</td><td></td></tr>
<tr><td></td><td>    (ii)  properly entered in  Gard P & I Club, Arendal, Norway,  P & I Club</td><td>496</td></tr>
</table>

and will so remain during the currency of this charter.   497
    ~~When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution~~   498
Damage, or when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the   499
escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage, whether or   500
not an escape or discharge in fact subsequently occurs), then Charterers may, at their option, upon notice to   501
Owners or master, undertake such measures as are reasonably necessary to prevent or minimise such Pollution   502
Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners   503
advised of the nature and result of any such measures taken by them and, if time permits, the nature of the   504
measures intended to be taken by them. Any of the aforementioned measures taken by Charterers shall be   505
deemed taken on Owners' authority as Owners' agent, and shall be at Owners' expense except to the extent that:   506
    (1)  any such escape or discharge or Threat was caused or contributed to by Charterers, or   507
    (2)  by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International   508
Convention on Civil Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such   509
escape or discharge or to the Threat, would have been exempt from liability for the same, or   510
    (3)  the cost of such measures together with all other liabilities, costs and expenses of Owners arising   511
out of or in connection with such escape or discharge or Threat exceeds one hundred and sixty United States   512
Dollars (US $160) per ton of the vessel's Tonnage or sixteen million eight hundred thousand United States   513
Dollars (US $16,800,000), whichever is the lesser save and insofar as Owners shall be entitled to recover such   514
excess under either the 1971 International Convention on the Establishment of an International Fund for   515
Compensation for Oil Pollution Damage or under CRISTAL:   516
    PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures   517
should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to   518
continue said measures under the provisions of this Clause 39 and all further liability to Charterers under this   519
Clause 39 shall thereupon cease.   520
    The above provisions are not in derogation of such other rights as Charterers or Owners may have   521
under this charter or may otherwise have or acquire by law or any International Convention or TOVALOP.   522
    The term "TOVALOP" means the Tanker Owners' Voluntary Agreement Concerning Liability   523
for Oil Pollution dated 7th January 1969, as amended from time to time, and the term "CRISTAL" means the   524
Contract Regarding an Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971, as   525
amended from time to time. The terms "Oil", "Pollution Damage", and "Tonnage" shall for the purposes of this   526
~~Clause 39 have the meanings ascribed to them in TOVALOP.~~   527

<table>
<tr><td>Export<br>Restrictions</td><td>40.  The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to<br>which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was<br>produced and/or shipped.</td><td>528<br>529<br>530</td></tr>
</table>

    Charterers shall procure that all bills of lading issued under this charter shall contain the following   531
clause:   532
    "If any laws, rules or regulations applied by the government of the country in which the cargo was   533
produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo   534
to the place of discharge designated in or ordered under this bill of lading, carriers shall be entitled to   535
require cargo owners forthwith to nominate an alternative discharge place for the discharge of the   536
cargo, or such part of it as may be affected, which alternative place shall not be subject to the   537
prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and   538
discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72   539
hours after they or their agents have received from carriers notice of such prohibition, carriers shall be   540
at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place   541
on which they or the master may in their or his absolute discretion decide and which is not subject to the   542
prohibition, and such discharge shall constitute due performance of the contract contained in this bill   543
of lading so far as the cargo so discharged is concerned".   544
    The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading   545
being deemed to be references to this charter.   546

9

**Law und**
**Litigation**

41.  (a)  This charter shall be construed and the relations between the parties determined in accordance with the laws of England.     547 548

(b)  Any dispute arising under this charter shall be decided by the English Courts to whose jurisdiction the parties hereby agree.     549 550

(c)  Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being in force.     551 552 553 554 555

(i)  A party shall lose its right to make such an election only if:     556
   (a)  it receives from the other party a written notice of dispute which –     557
     (1)  states expressly that a dispute has arisen out of this charter;     558
     (2)  specifies the nature of the dispute; and     559
     (3)  refers expressly to this clause 41(c)     560
   and     561
   (b)  it fails to give notice of election to have the dispute referred to arbitration not later than 30 days from the date of receipt of such notice of dispute.     562 563

(ii)  The parties hereby agree that either party may –     564
   (a)  appeal to the High Court on any question of law arising out of an award;     565
   (b)  apply to the High Court for an order that the arbitrator state the reasons for his award;     566
   (c)  give notice to the arbitrator that a reasoned award is required; and     567
   (d)  apply to the High Court to determine any question of law arising in the course of the reference.     568 569

(d)  It shall be a condition precedent to the right of any party to a stay of any legal proceedings in which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that party furnishes to the other party security to which that other party would have been entitled in such legal proceedings in the absence of a stay.     570 571 572 573

**Construction**

42.  The side headings have been included in this charter for convenience of reference and shall in no way affect the construction hereof.     574 575

Additional Clauses 43-49, as attached, are deemed to be incorporated in this Charter Party.

Durward Marine Terms 1-43, as amended, attached, are deemed to be incorporated in this Charter Party.


DISPONENT OWNERS

ERMIS MANAGEMENT COMPANY LIMITED

# EXHIBIT 2

1  Todd L. Bice, #4534
   Jarrod L. Rickard. #10203
2  BROWNSTEIN HYATT FARBER SCHRECK
   300 South Fourth Street. Suite 1200
3  Las Vegas, Nevada 89101
   Telephone:    (702) 382-2101
4  Facsimile:    (702) 382-8135

5  Attorneys for Plaintiff. Ermis Management
   Company Limited

6

7                    UNITED STATES DISTRICT COURT
                        DISTRICT OF NEVADA
8

9  In the Matter of the Arbitration

10          - between -

11 ERMIS MANAGEMENT COMPANY                    COMPLAINT
   LIMITED,
12
            Plaintiff,
13
            - and -
14
   UNITED CALIFORNIA DISCOUNT
15 CORPORATION D/B/A/ UNITED NEVADA
   TRADE INTERNATIONAL; JOSEPH P.
16 CLARK; AND DAVID B. CLARK,

17          Defendants.

18

19 Plaintiff Ermis Management Company Limited ("Plaintiff" or "Owner"), by and through its

20 attorneys. Brownstein Hyatt Farber Schreck, P.C., sues United California Discount Corporation.

21 d/b/a/ United Nevada Trading International ("Defendant" or "UNTI"), Joseph P. Clark ("Defendant")

22 and David B. Clark ("Defendant"). (collectively "Alter-Ego Defendants" or "Defendants"), and upon

23 information and belief. alleges as follows:

24                    **JURISDICTION AND VENUE**

25      1.      This is a matter within the admiralty and maritime jurisdiction of this Court within

26 the meaning of 28 U.S.C. §§ 1333 and Rule 9(h) of the Federal Rules of Civil Procedure.

27      2.      Durward Marine LLC ("Durward" or "Charterer") is and was at all times pertinent

28 hereto a business entity organized and existing under the laws of Nevada.  Personal jurisdiction over

*(left margin, vertical text)* BROWNSTEIN HYATT FARBER SCHRECK / 300 South Fourth Street, Suite 1200 / Las Vegas, Nevada 89101 / (702) 382-2101

1

1   Alter-Ego Defendants is proper because Durward was Joseph Clark's, David Clark's and UNTI's

2   alter-ego, and thus Durward's contacts with Nevada are attributed to Alter-Ego Defendants for

3   jurisdictional purposes.

4          3.    Venue is proper in this District pursuant to Rule 82 of the Federal Rules of Civil

5   Procedure as this is an admiralty and maritime claim within the meaning of 28 U.S.C. §§ 1333 and

6   Rule 9(h) of the Federal Rules of Civil Procedure and this Court has personal jurisdiction over the

7   Alter-Ego Defendants. by way of Durward being their alter-geo.  In the alternative, venue is also

8   proper in this District under 28 U.S.C. §§ 1391 (b) and (c), as Durward resides in this Judicial

9   District, Durward and Alter-ego Defendants are the same entities for alter-ego purposes, and

10  Durward's existence in Nevada must therefore be imputed to Alter-ego Defendants.

11                                    **THE PARTIES**

12         4.    At all times material herein, Plaintiff ERMIS MANAGEMENT COMPANY

13  LIMITED was and is a business entity organized and existing under the laws of and with a principal

14  place of business in Malta. and was the owner of the large ocean-going vessel M/V TOMIS WEST

15  (the "Vessel").

16         5.    Defendant UNTI. is a corporation duly organized under the laws of the State of

17  California with its principal place of business at 225 Avenue I, Suite 201, Redondo Beach,

18  California 90277.

19         6.    Defendant Joseph P. Clark is a resident of California and may be located at 220

20  Avenue I, Redondo Beach. California, 90277.

21         7.    Defendant David B. Clark is a resident of California and may be located at 220

22  Avenue I, Redondo Beach, California, 90277.

23                              **BACKGROUND ALLEGATIONS**

24  **The Agreement**

25         8.    On or about August 9, 1999, Plaintiff and Durward entered into an agreement titled

26  "Tanker Voyage Charter Party". whereby Durward contracted to lease (charter) the Vessel (the

27  "Agreement"). The Agreement required that Durward make lease payments (hire). for its use of the

28  Vessel, based on a daily rate to be paid twice monthly. The Agreement further required that

*BROWNSTEIN HYATT FARBER SCHRECK*
*300 South Fourth Street, Suite 1200*
*Las Vegas, Nevada 89101*
*(702) 382-2101*

2

1  Durward make the lease payments to a chartering broker, Essex Shipping Services, Ltd., which

2  would then remit the funds to Plaintiff (less an agreed commission).

3        9.    The Agreement allowed Durward to trade the Vessel on a world-wide basis, with

4  certain geographic limitations, typically by sub-chartering the Vessel to third-parties. These sub-

5  charterers would then make freight payments to Durward for the ocean transport of cargo. Durward,

6  as Charterer, was responsible for the payment of other costs. such as fuel oil (bunkers), agency fees

7  incurred for services provided to the Vessel and unloading charges (stevedoring). A true and correct

8  copy of the Agreement is submitted herewith, as Exhibit ("Exh.") "1".

9       10.    The Agreement provides that any disputes thereunder shall be decided by arbitration

10  in London in accordance with the laws of England.

11       11.    The Vessel was tendered by Plaintiff to Durward for service under the Agreement in

12  August, 1999. The parties thereafter extended the period of the Charter, which ultimately set the end

13  of the contract in August 2000. when the Vessel was to complete its final voyage under the

14  Agreement.

15       12.    On or about July 12, 2000, during the course of the Agreement, and without prior

16  notice or warning, Durward affirmatively and unequivocally repudiated the Agreement. Defendant

17  Joseph Clark stated in writing that Durward "is not capable capable [*sic*] of making any payments on

18  monies owed now or in the future."

19       13.    Since cargo was on board the Vessel at the time of Durward's repudiation (consigned

20  to a third-party), Plaintiff, as owner of the Vessel. was legally obligated to complete the voyage.

21  which it did. Accordingly, the Vessel proceeded to the discharge ports and discharged the cargo,

22  even though Plaintiff did not receive the required payments from Durward. Further, Plaintiff was

23  forced to pay for services provided to the Vessel by third parties, which were Durward's

24  responsibility to pay. Finally, Plaintiff was forced to settle the Vessel's fuel oil (bunker) debts,

25  incurred by Durward in order to lift the arrest of the Vessel in Karachi, Pakistan. Similarly, the

26  other parties involved (*e.g.*, cargo owners) had rights against the Vessel. Thus. while Durward

27  clearly was obliged to pay those parties, when it unilaterally reneged on its obligations. it forced

28

BROWNSTEIN HYATT FARBER SCHRECK
300 South Fourth Street, Suite 1200
Las Vegas, Nevada 89101
(702) 382-2101

3

1   Plaintiff to pay Durward's debts. As a result of Charterer's breach of the Agreement, Plaintiff, as

2   Owner, sustained damages.

3           14.     As set forth below, the reason Durward had misrepresented that it had no "capability"

4   to pay was due to the fact that the money it had received from the sub-charterer for this specific

5   voyage was instead paid to Durward's *alter ego* – Defendant UNTI – at the specific direction of

6   Defendant Joseph Clark.

7   **The Arbitration**

8           15.     Subsequent to Durward's breach of the Agreement, Plaintiff demanded arbitration of

9   the dispute in London in accordance with the Agreement's terms. An arbitrator was appointed and

10  the arbitration proceedings were conducted. Despite notification and the opportunity to be heard at

11  all relevant times, Durward did not participate.

12          16.     On April 30, 2002, the arbitrator rendered the Final Arbitration Award and Reasons

13  for Final Arbitration Award, awarding Plaintiff $682,654.36 in principal amount, as well as interest,

14  costs and attorneys' fees arising from the arbitration (collectively the "Award"). A true and correct

15  copy of the Award is submitted herewith as Exh. "2".

16          17.     In the ruling, the arbitrator noted Durward's lack of responses to the Plaintiff's

17  arbitration demand and the arbitrator's directions to submit a Defense and Counterclaim, if any.

18          18.     Following issuance of the Award, Durward failed to make payment or to respond to

19  demand for payment.

20          19.     Due to Durward's non-responsiveness, on October 15, 2002, Plaintiff filed a Notice of

21  Petition and Petition to Confirm the Arbitration Award in this Court, in the state where Durward is

22  duly organized and existing. True and correct copies of the Petition are submitted herewith as Exh.

23  "3".

24          20.     On December 3, 2002, this Court signed an order confirming the Award and finding

25  the Plaintiff was entitled to recover its attorneys' fees related to the proceedings. A true and correct

26  copy of the Order ("Nevada Order") is submitted herewith as Exh. "4".

27

28

BROWNSTEIN HYATT FARBER SCHRECK
300 South Fourth Street, Suite 1200
Las Vegas, Nevada 89101
(702) 382-2101

4

1    21.    On that same day. this Court signed a judgment in favor of Ermis against Durward in

2   the amount of $784,226.10, in addition to post-judgment interest.  A true and correct copy of the

3   Judgment ("Nevada Judgment") is submitted herewith as Exh. "5".

4    22.    In the Nevada Order. the Court found that jurisdiction was proper and that Durward,

5   by failing to appear in the confirmation proceeding before him. waived any right to contest the

6   confirmation.  In addition, the Court reviewed the arbitration Award and found that due process was

7   afforded to Durward in the arbitration proceeding.  Therefore. for good cause shown, the arbitration

8   Award was confirmed.

9    23.    Thereafter. Plaintiff attempted to collect pursuant to the Nevada Judgment. but could

10  not enforce the judgment because Durward was insolvent due to the acts of the Alter-Ego

11  Defendants as outlined below.

12   24.    The Alter-Ego Defendants are liable for the acts of Durward as alleged in this

13  Complaint.  Recognition of the privilege of separate existence would promote injustice because

14  Defendants Joseph P. Clark and David B. Clark in bad faith dominated and controlled Durward and

15  ignored its separate legal existence. with the assistance of Defendant UNTI. as set forth in the

16  following paragraphs:

17   25.    Plaintiff registered the Nevada Judgment against Durward in the District Court for the

18  Central District of California on April 30. 2003.  From May 2003 through August 2005. Plaintiff

19  diligently conducted discovery concerning Durward's assets in an effort to collect the Judgment.

20  including, but not limited to, discovery directed to the principals of Durward, Defendant Joseph P.

21  Clark and Defendant David B. Clark, who were and are Durward's 100% dominating stockholders.

22  From January 2006 through approximately the Summer of 2006, Plaintiff conducted a detailed

23  analysis of the information obtained during such discovery proceedings.

24  **Durward's Lack of Capitalization**

25   26.    Plaintiff is informed and believes that the initial start-up costs for Durward were

26  $350.000.  However, the initial capital required to be contributed by Defendants according to

27  Durward's Operating Agreement was far less -- $12.000.  This capital was to be comprised of $1,200

28  from Defendant Joseph Clark and $10,800 from Defendant David Clark.

BROWNSTEIN HYATT FARBER SCHRECK
300 South Fourth Street, Suite 1200
Las Vegas, Nevada 89101
(702) 382-2101

5

1    27.    Plaintiff is informed and believes that Defendants Clarks never made their required

2    capital contributions to Durward, as Durward's bank account was not opened at Wells Fargo Bank

3    until August 1999, at which time a telephone transfer of $10,000 was received from Defendant

4    UNTI and no source of member equity is reflected in Durward's financial statements.

5    28.    Plaintiff is informed and believes the only deposits into Durward's Wells Fargo Bank

6    account during Durward's first two months of operations were made by Defendant UNTI, and not by

7    the Clarks.

8    **Durward's Failure to Follow Corporate Formalities**

9    29.    Durward's Operating Agreement, dated March 30, 1999 and signed by Joseph Clark,

10    identified as "Manager" and David B. Clark, identified as "Managing Member", reflects the Clarks'

11    proportional interests in Durward as follows: Defendant Joseph Clark at 10% and Defendant David

12    Clark at 90%. However, Plaintiff is informed and believes that Durward failed to issue membership

13    certificates reflecting such ownership.

14    30.    Subsequent filings by Durward demonstrate its failure to abide by corporate

15    formalities in that such filings contain information that conflicts with the Operating Agreement and

16    make it difficult for third parties to determine who is authorized to sign documents on behalf of

17    Durward.  Shortly after the date of the Operating Agreement, on April 7, 1999, a Nevada corporate

18    filing lists the managers of Durward as Joseph Clark and Thomas Cornwall, rather than Joseph Clark

19    and David Clark, as stated in the Operating Agreement[1].

20    31.    In another subsequent filing, dated September 7, 1999, the only managers of Durward

21    are again identified as Defendants Clarks.

22    32.    Durward made a further filing on February 10, 2000, where the only manager is

23    identified as Dennis L. Jones[2] and the only member as James W. Burch.

24

25

26    _____

[1] Mr. Cornwall was the principal of Pentland Management, Inc. ("Pentland"), the marine company
27    that assisted in managing Durward.
[2] Plaintiff is informed and believes that Mr. Jones acted as a consultant to Durward.  In some
28    documents, Mr. Jones has also been listed as "Other Officer, Shareholder or Partner" of Durward.

BROWNSTEIN HYATT FARBER SCHRECK
300 South Fourth Street, Suite 1200
Las Vegas, Nevada 89101
(702) 382-2101

33.     The final relevant filing was made by Durward on July 21, 2000, listing Dennis L. Jones as the manager and Joe Clark as the member.

34.     Plaintiff is informed and believes that Durward's failure to abide by corporate formalities is further demonstrated by its failure to keep corporate minutes and resolutions.

**UNTI's and The Clarks' Undue Influence and Control Over Durward**

35.     Plaintiff is informed and believes that, while the Clarks had failed to contribute any initial start-up costs to Durward, operating funds were instead apparently obtained by Durward pursuant to a purported loan arrangement with Defendant UNTI. Plaintiff is informed and believes that Defendant UNTI is purportedly in the purchase order finance and issuance of letters of credit business.

36.     Plaintiff is informed and believes that Durward and UNTI were dominated and controlled by the Clarks. 100% of the capital stock of Defendant UNTI is owned by Defendant David Clark, who is also a Managing Member and owner of Durward. Plaintiff is further informed and believes that the directors of Defendant UNTI include Defendant David Clark (President) and Defendant Joseph Clark (Vice-President). Defendant Joseph Clark is also a Manager and owner of Durward.

37.     Plaintiff is further informed and believes that Defendant Joseph Clark on at least one occasion signed a document filed with the Secretary of State by Durward as the Managing Member of UNTI, thereby demonstrating a confusion of the corporate records of Durward and UNTI.

38.     Shortly before the Vessel was chartered (August 8, 1999), Durward entered into various agreements with its *alter-ego*, Defendant UNTI. The application form indicates that Durward was applying for a "purchase order financing program." The application lists Defendant David Clark as Durward's principal and Defendant Joseph Clark as "Secretary or Other Partner."

39.     The agreements entered into between Durward and UNTI require the execution of certain supporting documents identifying each related contract and buyer credit and the maximum amount to be invested in Durward by UNTI; a "Trade Order" acceptance; and "Bills of Sale" identifying buyer accounts. Plaintiff is informed and believes that no such documents were ever executed.

BROWNSTEIN HYATT FARBER SCHRECK
300 South Fourth Street, Suite 1200
Las Vegas, Nevada 89101
(702) 382-2101

1    40.    In a letter to Mr. Dennis Jones dated August 1, 1999, Defendant UNTI sets forth the

2    terms of the transaction which was to include a personal guaranty from one Durward principal.  The

3    August 1, 1999 letter was signed by Ms. Rowena N. Sia on behalf of Defendant UNTI and by Mr.

4    Jones on behalf of Durward.

5    41.    Plaintiff is informed and believes that Ms. Sia was employed by Defendant UNTI in

6    its Los Angeles office.  Plaintiff is further informed and believes that Ms. Sia also worked for

7    Durward, at the direction of Defendant Joseph Clark.  Plaintiff is further informed and believes that

8    Ms. Sia signed numerous documents on behalf of both Durward and Defendant UNTI, as well as

9    another company operated by Defendants Joseph Clark and David Clark – Riviera Business Credit.[3]

10    42.    In addition to sharing corporate officers, *i.e.*, Defendants Clarks. and employees, *e.g.*,

11    Ms. Sia, Defendants Durward and UNTI also shared office space and telephone numbers in

12    California and/or Nevada.

13    43.    On August 1, 1999, Defendant Joseph Clark executed the personal guaranty for the

14    indebtedness of Durward to Defendant UNTI, as required by the August 1, 1999 letter, with a

15    maximum amount of $3,000,000.[4]  Plaintiff is informed and believes that Defendant Joseph Clark

16    was himself in a position to decline to enforce his guarantee as Vice President of UNTI.

17    44.    The financing arrangement between Defendant Durward and defendant UNTI is

18    reflected in security agreements dated August 1, 1999, signed by Dennis Jones on behalf of Durward

19    and Defendant Joseph Clark as President of Defendant UNTI.  At that time, Joseph Clark was also a

20    dominating shareholder and member of Defendant Durward.

21    45.    The August 1, 1999 security agreements indicate that Defendant UNTI would make

22    advances to Durward with a resulting security interest granted to Defendant UNTI.  However, while

23    the documents reflect a transaction-by-transaction basis of repayment, they do not indicate a specific

24    date for repayment of the funds advanced by Defendant UNTI.

25

26

27    _____

[3] Plaintiff is informed and believes that Durward paid invoices issued to Riviera Business Credit.

28    [4] Durward's original facility with UNTI is listed as $1,000,000, with a transaction fee of 7% and
1.75% interest per month.

8

BROWNSTEIN HYATT FARBER SCHRECK
300 South Fourth Street, Suite 1200
Las Vegas, Nevada 89101
(702) 382-2101

1       46.    In November 1999, a UCC-1 statement was filed with the State of Nevada wherein

2   Durward granted a security interest to Defendant UNTI of essentially all Durward's assets, including

3   all present and future accounts receivable.

4       47.    A second set of UNTI financing documents was prepared and executed on December

5   1, 1999. In these materials, Defendant Joseph Clark signed Durward's resolution as Secretary, while

6   also acting as an officer of Defendant UNTI.

7       48.    On January 21, 2000, an internal project proposal was prepared to the attention of

8   Defendant UNTI's board of directors. The form lists three names in that category: "[Defendant] J.

9   Clark, [Defendant] D. Clark and Massoumi."

10  **Diversion of Assets From Durward For Improper Uses**

11      49.    During the course of its active business operations, Plaintiff is informed and believes

12  that Durward maintained a stock trading account, an option trading account and a margin account at

13  Morgan Stanley Dean Witter. Plaintiff is informed and believes that Durward listed its option

14  trading account investment objectives as: speculation, aggressive income and investment hedge and

15  income.

16      50.    Plaintiff is informed and believes that Defendants Clarks caused Durward to divert

17  corporate funds intended for its business operations in order to pay margin interest to Morgan

18  Stanley Dean Witter.

19      51.    The agreements entered into between Durward and UNTI required that goods be

20  purchased for Durward from suppliers approved by UNTI. Instead, Plaintiff is informed and

21  believes that funds were advanced by UNTI directly to Durward. Joseph Clark and Ms. Sia caused

22  Durward to divert such funds received from UNTI and intended for operational uses to Durward's

23  stock, margin and options trading accounts at Morgan Stanley, where Durward lost approximately

24  $86.000 in speculative stock investments during the period January 2000 to May 2000.

25      52.    Plaintiff is informed and believes that Durward had insufficient income from

26  operations to make speculative stock investments, which resulted in a diversion of assets from its

27  creditors and in a lack of corporate assets owned by Durward.

28  **Failure to Segregate Funds of Durward and UNTI**

BROWNSTEIN HYATT FARBER SCHRECK
300 South Fourth Street, Suite 1200
Las Vegas, Nevada 89101
(702) 382-2101

1    53.    Plaintiff is informed and believes that Defendants Durward and UNTI were both

2    owned and controlled by Defendants Clarks, as Defendant Durward's bank account was opened at

3    Wells Fargo Bank in August 1999 with an inadequately documented $10,000 telephone transfer

4    made by Defendant UNTI.

5    54.    Plaintiff is informed and believes that, as debts were incurred by Durward, the

6    invoices were paid with Defendant UNTI's deposits into Durward's accounts or, at times, directly by

7    Defendant UNTI.

8    55.    Conversely, as freights and "demurrage"[5] payments were received from sub-

9    charterers, prompt and regular disbursements of such funds were made from Durward's account(s) to

10    Defendant UNTI.  The authorizations for these payments on behalf of Defendant Durward were

11    typically executed by Defendant Joseph Clark or Ms. Sia.  Plaintiff is informed and believes that

12    funds were regularly transferred from Durward to UNTI with no documentation other than a written

13    instruction to Durward's financial institution.

14    56.    Plaintiff is informed and believes that Durward also paid debts incurred to Pentland

15    Management, Ltd. by its related entity – Riviera Business Credit.

16    **Manipulation of Durward's Assets During The Vessel's Final Voyage**

17    57.    Plaintiff is informed and believes that an agreement was reached for the Vessel's final

18    sub-charter on May 24, 2000.  On that same day, Defendant Joseph Clark, describing himself as

19    Durward's President and Secretary, filled out the application to open the account at Penson Financial

20    Services in Texas.  However, on this date, according to Durward's corporate filings, Defendant

21    Joseph Clark held neither office in Durward.

22    58.    On June 13, 2000, the first deposit was made in Durward's Penson account by wire

23    transfer from Durward's Morgan Stanley account in the sum of $6,000.  The following day, June 14,

24    2000, the sub-charterer's initial freight payment of $667,426.35 was made into Durward's Morgan

25    Stanley account.

26

27    _____

28    [5] "Demurrage" refers to payments made when a vessel's time in port exceeds an agreed period.

BROWNSTEIN HYATT FARBER SCHRECK
300 South Fourth Street, Suite 1200
Las Vegas, Nevada 89101
(702) 382-2101

1       59.    Plaintiff is informed and believes that, in view of Durward's history of operating

2  losses, the Clarks allowed the Vessel to embark on its final voyage with the expectation that

3  Defendants Clarks, acting in concert with Durward's alter-ego, UNTI, would recoup at least a

4  portion of such losses from the payments made by the sub-charterer on the final voyage.

5       60.    Plaintiff is informed and believes that, after making some current payments, such as

6  the June 15 hire payment to Plaintiff of $131,250.00 and a bunker payment of $74,118.65, as well as

7  agency fees of $32,223.80, the balance of the freight, approximately $400,000.00, was wire

8  transferred from Durward's Morgan Stanley account to Durward's Penson account on or about June

9  16, 2000. Plaintiff is further informed and believes that the sub-charterer's balance of freight

10  payment ($182,011.15) was made directly into Durward's Penson account on or about July 3, 2000.

11       61.    Plaintiff is informed and believes that, between June 21, 2000 and July 5, 2000, at

12  Defendant Joseph Clark's direction, approximately $550,000.00 was paid to Defendant UNTI from

13  Durward's Penson account, leaving a negligible balance in such account and leaving Durward with

14  insufficient capital to operate. Plaintiff is further informed and believes that the payment to UNTI

15  rendered Durward unable to pay all of the expected expenses to be incurred during the Vessel's final

16  voyage. Therefore, Durward was unable to meet its financial obligations arising from the Vessel's

17  final voyage.

18       62.    Plaintiff is informed and believes that, on July 11, 2000, Defendant Joseph Clark

19  informed Mr. Cornwall that Durward would make no further payments to Plaintiff or other creditors,

20  even though Defendant Joseph Clark was fully aware that the Vessel was laden with cargo and

21  Plaintiff would be required to complete the voyage whether or not Durward fulfilled its

22  responsibilities.

23  **CAUSE OF ACTION**

24  **Action to Pierce the Corporate Veil of**

25  **Defendants in order to Enforce the Nevada Judgment**

26       63.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1

27  through 62.

28

BROWNSTEIN HYATT FARBER SCHRECK
300 South Fourth Street, Suite 1200
Las Vegas, Nevada 89101
(702) 382-2101

11

64.     Plaintiff herein alleges that Durward is the alter-ego of Defendant UNTI, Defendant Joseph P. Clark. and Defendant David B. Clark in that they individually or in concert completely and totally dominated and controlled Durward. the debtor against whom the Nevada Judgment was entered.

65.     Defendants Joseph P. Clark and David B. Clark owned all shares of Durward and Defendant UNTI and disregarded the corporate forms of such entities by funneling monies to and from each entity in an attempt to avoid creditors.

66.     Defendants Joseph P. Clark and David B. Clark had common and overlapping stock ownership of Durward and Defendant UNTI.

67.     Defendants Joseph P. Clark and David B. Clark were overlapping directors and officers for Durward and Defendant UNTI.

68.     Defendants Joseph P. Clark and David B. Clark used the same corporate offices for Durward and Defendant UNTI.

69.     Defendants Joseph P. Clark and David B. Clark organized and carried on the business of Durward without adequate capital or sufficient assets available to meet prospective liabilities. The capital of Durward was trifling compared with its business and risks of loss.  Further, assets were funneled out of Durward to Defendant UNTI when Durward's financial viability was in doubt. As a result. Durward was without assets to meet its debts, including the obligations to Plaintiff alleged in this Complaint.

70.     Defendants Joseph P. Clark and David B. Clark wholly controlled the financing of Durward, through its other company. Defendant UNTI.  Plaintiff is informed and believes that Defendants Joseph P. Clark and David B. Clark thereby commingled the assets of Durward with those of Defendant UNTI.

71.     The loan transaction between Defendant UNTI and Durward was used to divert assets from Durward's creditors. including Plaintiff.

72.     Defendants Joseph P. Clark and David B. Clark handled the decision-making for Durward. including but not limited to, employment decisions. investments. and financing.

BROWNSTEIN HYATT FARBER SCHRECK
300 South Fourth Street, Suite 1200
Las Vegas, Nevada 89101
(702) 382-2101

73.    Defendants Joseph P. Clark and David B. Clark, as directors and/or officers of Durward, did not act independently in the interests of Durward but in the interests of themselves.

74.    Defendants Joseph P. Clark and David B. Clark did not abide by proper corporate formalities in their operation of Durward in that financial transactions were conducted with insufficient documentation, conflicting documents were filed with the Secretary of State, membership certificates were never issued and meeting minutes were not maintained.

75.    As a result of the actions of *alter-ego* Defendants Joseph P. Clark, David B. Clark, and UNTI, Plaintiff suffered injustice and substantial damages.

76.    Because of these unjust, inequitable and improper actions. Plaintiff has suffered damages in an amount equal to the arbitration award and the Nevada Judgment, including interests and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.    Entering judgment against Defendants Joseph P. Clark, David B. Clark and UNTI, by way of piercing Durward's corporate veil and holding Defendants Joseph P. Clark, David P. Clarke and UNTI, jointly and severally liable for Durward's debt to Plaintiff in the principal amount of $784,226.10 plus pre-judgment interest as allowed by maritime law as well as post-judgment interest as allowed by law.

B.    Awarding Plaintiff its legal fees, specifically pled as special damages pursuant to FRCP 9(g) and included as costs under English law, incurred in bringing the arbitration, the confirmation action and the enforcement thereof, the action in California and this action.  As this aspect of the claim is based on English law, Plaintiff hereby provides notice of its intent to rely on English law on this aspect of its claim, in accordance with FRCP 44.1; and,

C.    Awarding Plaintiff such other, further or different relief as this Court may deem just and proper.

BROWNSTEIN HYATT FARBER SCHRECK
300 South Fourth Street, Suite 1200
Las Vegas, Nevada 89101
(702) 382-2101

13

1   Dated: August 1, 2007                    Respectfully submitted,

2                                            BROWNSTEIN HYATT FARBER SCHRECK, P.C.

3

4                                            By

5                                                Todd L. Bice
                                                 Jarrod Rickard
6
                                             300 South Fourth Street, Suite 1200
7                                            Las Vegas, Nevada 89101
                                             Telephone:   (702) 382-2101
8                                            Facsimile:   (702) 382-8135

9                                            Attorneys for Plaintiff,
                                             Ermis Management Company Limited
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

# EXHIBIT 3

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

ERMIS MANAGEMENT COMPANY
LTD.,

          Plaintiff,

v.

UNITED CALIFORNIA DISCOUNT
CORPORATION d/b/a UNITED
NEVADA TRADE INTERNATIONAL,
JOSEPH P. CLARK, DAVID B. CLARK,

          Defendants.

2:07-CV-01021-PMP-RJJ

O R D E R

      Presently before the Court is Defendants' Motion for Summary Judgment (Doc. #70), filed on February 27, 2009. Defendants filed a Supplement (Doc. #71) on March 2, 2009. Plaintiff filed an Opposition (Doc. #74), Counter-Statement of Material Facts (Doc. #75), and Exhibits (Doc. #76) on April 24, 2009. Defendants filed a Reply (Doc. #77) and supporting declarations (Doc. #78, #79) on May 15, 2009. The Court held a hearing on this matter on July 28, 2009.

I.      **BACKGROUND**

      Plaintiff Ermis Management Company Limited seeks to enforce a judgment awarded against non-party Durward Marine, LLC ("Durward") by recovering from Durward's alleged alter egos, Defendants Joseph Clark ("J. Clark"), David Clark ("D. Clark"), and United California Discount Corporation d/b/a United Nevada Trade International ("UNTI"). Plaintiff was the bareboat charterer of a deep sea vessel, the Tomis

West, pursuant to a bareboat charter with the Tomis West's owner. (Pl.'s Opp'n to Defs.' Mot. Summ. J. (Doc. #74) ["Opp'n"], Decl. Chatzimichailoglou ¶ 27.) Plaintiff's purpose as a bareboat charterer was to receive earnings of the Tomis West by entering into charter agreements with other companies, such as Durward. (Id. ¶ 29.) Ermis Maritime Company Limited ("Maritime") was the manager of Plaintiff. (Id. ¶ 31.)

Durward was in the business of chartering and operating deep sea tanker vessels. (Defs.' Mot. Summ. J. (Doc. #70) ["MSJ"], Ex. A-2 at 1.) The purpose of starting Durward as a company was to provide the means to repay a debt owed by Sealock Tanker Company ("Sealock"), another vessel chartering company, to Rivera Business Credit ("RBC"). (MSJ, Aff. D. Clark ¶¶ 6-8.) RBC was formed by D. Clark and others in 1968 and was in the business of accounts receivable financing and equipment lending and leasing. (Id. ¶ 5.) In 1997-1998, RBC provided funding to Sealock, which sustained losses of over $2,000,000. (Id. ¶ 6.) Sealock's principal was Thomas Cornwall ("Cornwall"). (Id.)

In January 1999, Cornwall approached D. Clark and J. Clark[1] about financing a new entity to charter and operate deep sea tanker vessels to trade in vegetable oil on a worldwide basis. (MSJ, Aff. D. Clark ¶¶ 7, 10; Supp. Defs.' Mot. Summ. J. (Doc. #71) ["Supp. MSJ"], Aff. J. Clark ¶¶ 5, 7.) Cornwall represented that he had extensive knowledge and experience in the maritime industry and provided the Clarks with a business plan, synopsis of vessels trading in vegetable oil, and profit and loss projections. (MSJ, Aff. D. Clark ¶ 10; Supp. MSJ, Aff. J. Clark ¶ 7.) Because the Clarks believed neither Sealock nor Cornwall could repay the Sealock debt, they decided to enter into an arrangement to form Durward with Cornwall. (MSJ, Aff. D. Clark ¶ 11; Supp. MSJ, Aff. J. Clark ¶ 8.)

///

---

[1] D. Clark is the father of J. Clark. (MSJ, Aff. D. Clark ¶ 7; Supp. Defs.' Mot. Summ. J. (Doc. #71), Aff. J. Clark ¶ 5.)

1    Durward originally was formed in Nevada in 1998 as United Capital Finance, LLC

2  with D. Clark and Steven Alexander ("Alexander"), a former RBC employee, as managers.

3  (MSJ, Aff. D. Clark ¶ 14, Ex. A-3.)  In an April 7, 1999 filing with the Nevada Secretary of

4  State, the company's name was changed to Durward, Alexander was removed as a

5  managing member, and J. Clark and Cornwall were added as managing members.  (Supp.

6  MSJ, Ex. B-1.)  On March 30, 1999, J. Clark and D. Clark executed a Durward operating

7  agreement, pursuant to which J. Clark was a 10% owner with a $1,200 initial capital

8  contribution and D. Clark was a 90% owner with a $10,800 initial capital contribution.

9  (Supp. MSJ, Ex. B-2; Opp'n, Decl. Hohenstein, Ex. 21 at 15.)  The Clarks averred that they

10  do not know if they made the initial capital contributions but that no capital accounts were

11  ever opened in their names.  (MSJ, Aff. D. Clark ¶ 17; Supp. MSJ, Aff. J. Clark ¶ 13.)

12    On May 11, 1999, Cornwall, on behalf of his entity Pentland Management, Ltd.,

13  ("Pentland") and D. Clark entered into a management agreement (the "Pentland

14  Agreement").  (MSJ, Aff. D. Clark ¶ 12, Ex. A-2.)  Pursuant to the Pentland Agreement,

15  Cornwall through Pentland was to provide management services to Durward for a monthly

16  fee of $22,750.  (MSJ, Aff. D. Clark ¶ 13, Ex. A-2 at 1.)  Further, the Sealock debt was to

17  be repaid through Durward profits, and ownership of Durward was to be transferred to

18  Pentland on a progressive basis concomitantly with repayment.  (MSJ, Aff. D. Clark ¶ 13,

19  Ex. A-2 at 1-2.)  After the debt was repaid in full, Pentland was to own 100% of Durward.

20  (MSJ, Ex. A-2 at 2.)

21    J. Clark and D. Clark agreed to ask Dennis Jones ("Jones") to be Durward's day-to-

22  day manager and administrator of Durward.  (MSJ, Aff. D. Clark ¶ 18; Supp. MSJ, Aff. J.

23  Clark ¶ 14.)  Jones was to oversee Cornwall and act as a liaison between Cornwall and J.

24  Clark.  (MSJ, Aff. D. Clark ¶ 18; Supp. MSJ, Aff. J. Clark ¶ 14.)  Jones testified that he was

25  paid by Durward but the checks came from UNTI.  (Opp'n, Decl. Hohenstein, Ex. 10 at

26  187.)  In an August 4, 1999 email, Cornwall represented to Jones that start up costs for the

1    first voyage would be $350,000. (Opp'n, Decl. Hohenstein, Ex. 20.)

2        Financing for Durward's operations was provided by UNTI, which was Durward's

3    purchase order financer and only secured creditor. (MSJ, Aff. D. Clark ¶ 20.) D. Clark

4    purchased UNTI in his own capacity, remains the sole owner of UNTI, and is an

5    officer/director of UNTI. (Id. ¶¶ 20, 27.) J. Clark also acted as UNTI's president during

6    the period relevant to this case. (Supp. MSJ, Aff. J. Clark ¶ 19.) UNTI averages between

7    six and twelve clients at any given time. (MSJ, Aff. D. Clark ¶ 25.) D. Clark testified that

8    any revenue UNTI received from Durward was "insignificant" as compared to UNTI's

9    overall revenue. (Id. ¶ 24.) UNTI, RBC, and Durward shared office space in California.

10   (Opp'n, Decl. Hohenstein, Ex. 3 at 23.)

11       In August 1999, UNTI and Durward entered into an Import/Export Finance Security

12   Agreement and a Purchase Order Financing/Factoring Agreement, both of which were

13   standard UNTI forms. (MSJ, Aff. Mitchell ¶ 7.) UNTI agreed to provide credit extensions

14   as Durward requested and UNTI approved. (Supp. MSJ, Aff. J. Clark ¶ 26.) Durward was

15   required to pay a 7% fee plus interest at 1.75% per month for this credit. (Id.) UNTI filed a

16   financing statement granting UNTI a security interest in Durward's assets. (Id. ¶ 29.)

17   UNTI also obtained signatory authority over Durward's bank accounts, which was a

18   common UNTI business practice. (MSJ, Aff. Mitchell ¶ 6.) Further, J. Clark executed a

19   personal guarantee, another standard UNTI form, for $3,000,000 and later $5,000,000 in

20   favor of UNTI for Durward's debt. (Supp. MSJ, Aff. J. Clark ¶ 28; Opp'n, Decl.

21   Hohenstein, Ex. 7 at 76, 118.)

22       On August 16, 1999, Durward entered into a Time Charter Party Agreement

23   ("Charter Agreement") with Plaintiff to charter the Tomis West. (Supp. MSJ, Aff. J. Clark

24   ¶ 24, Ex. B-4.) Plaintiff entered the Charter Agreement based on its shipping broker's

25   general knowledge of the maritime industry. (MSJ, Ex. E-2 at 8-9.) Mark Port ("Port"), an

26   employee for Plaintiff's broker Essex Shipping Services Limited, informed Peter Wright

4

1  ("Wright") of Enalios Marine Limited, Plaintiff's agent, that Durward was a new company

2  and the business was through Cornwall. (Opp'n, Decl. Wright ¶¶ 5, 21-22.) Although

3  Wright did not know Cornwall, Port had worked with Cornwall in the past. (Id. ¶ 22.) Port

4  advised that these were serious people who wanted to charter the ship for the vegetable oil

5  trade from wherever it was in the world. (Id.)

6         The initial term of the Charter Agreement was to charter the Tomis West for three

7  months with an option to extend. (Opp'n, Decl. Wright ¶ 24, Ex. 2.) On October 18, 1999,

8  Durward exercised its option for a second three month period. (Opp'n, Decl. Wright ¶ 24,

9  Ex. 3.) In December 1999, the final three month option was replaced with a six month term

10 so that the contract was extended to August 2000. (Opp'n, Decl. Wright ¶ 25, Ex. 4.)

11        On January 31, 2000, the Durward operating agreement was amended to reflect that

12 J. Clark and D. Clark had resigned as members of Durward, transferring their interests to

13 Jones (as 90% owner) and James Burch ("Burch") (as 10% owner). (Supp. MSJ, Ex. B-3.)

14 J. Clark testified that neither Jones nor Burch ever made capital contributions, but J. Clark

15 was unsure whether that was required under the operating agreement. (Supp. MSJ, Aff. J.

16 Clark ¶ 17.) On February 10, 2000, Durward's articles of organization were amended with

17 the Nevada Secretary of State to reflect that Jones and Burch were the only two Durward

18 members. (Supp. MSJ, Ex. B-1.)

19        Burch was a high school friend of J. Clark. (Opp'n, Decl. Hohenstein, Ex. 8 at 12.)

20 Burch testified that J. Clark had asked him to sign some documents to prevent a conflict of

21 interest but that he had no understanding of what he signed. (Id. at 14, 20.) J. Clark

22 testified that he asked Burch because he thought the law required Durward to have two

23 members, but that J. Clark continued to be actively involved in Durward's business as

24 manager. (Supp. MSJ, Aff. J. Clark ¶¶ 16, 19.) D. Clark testified that by the end of 1999,

25 he had become busy with another of his companies and therefore it made sense that Jones

26 would be listed as the manager of Durward. (MSJ, Aff. D. Clark ¶ 19.)

1     D. Clark testified that he did not commingle his personal funds with those of

2  Durward. (Opp'n, Decl. Hohenstein, Ex. 6 at 10.) A Durward check register demonstrates

3  deposits from D. Clark for $100,000 and $90,000 and from his wife Madeleine Clark for

4  $110,000 in August 1999. (Opp'n, Decl. Hohenstein, Ex. 5 at 70-71, Ex. 43.) These

5  transactions are labeled "note[s] payable." (Opp'n, Decl. Hohenstein, Ex. 5 at 70-71, Ex.

6  43.) D. Clark did not remember the circumstances of these transactions. (Opp'n, Decl.

7  Hohenstein, Ex. 5 at 70-71.) Additionally, on March 22, 2000, D. Clark authorized a wire

8  of $271,250 from his deceased mother's trust to Essex Shipping Services, Plaintiff's broker.

9  (Opp'n, Decl. Hohenstein, Ex. 6 at 100, Ex. 113.) D. Clark testified that this could have

10  been a loan to Durward. (Opp'n, Decl. Hohenstein, Ex. 6 at 100.)

11     Durward's bank accounts also reference a check payable to American Express for

12  the same amount as the balance of J. Clark's corporate American Express account. (Decl.

13  Leigh Davis in Supp. of Defs.' Reply (Doc. #78) ["Decl. Davis"], Ex. 1 at 208-10.)

14  Documents associated with this transaction label this a "loan payable" to J. Clark. (Decl.

15  Rowena Mitchell in Supp. of Defs.' Reply (Doc. #79) ["Decl. Mitchell"], Ex. 2.) However,

16  J. Clark was not able to recall the circumstances of this transaction. (Decl. Davis, Ex. 1 at

17  209-10.) Further, J. Clark engaged in stock transactions, resulting in a loss of $86,264.38 of

18  Durward's funds. (Id. at 219.) J. Clark testified that the purpose of the transactions was

19  "[s]trictly in the welfare of profitability and investment for the company." (Id. at 220.)

20     J. Clark could not recall if Durward had an annual meeting pursuant to the Durward

21  operating agreement, which states the "[m]embers must have an annual meeting to be held

22  on August 10." (Supp. MSJ, Ex. B-2 at 8; Opp'n, Decl. Hohenstein, Ex. 7 at 37.) Further,

23  federal tax documents were prepared for Durward in 1999, 2000, and 2001. (Opp'n, Decl.

24  Hohenstein, Ex. 23.) Although an accountant prepared Schedule K-1s for Jones and J.

25  Clark, Jones did not account for the K-1 on his personal taxes. (Opp'n, Decl. Hohenstein,

26  Ex. 10 at 193-95, Ex. 23.) J. Clark was not sure if he had accounted for the K-1s on his

1    taxes. (Opp'n, Decl. Hohenstein, Ex 7 at 236-40.) The evidence does not demonstrate

2    whether D. Clark or Burch received Schedule K-1s.

3            Rowena Mitchell, a former UNTI account executive, testified that Durward regularly

4    needed more money than projected. (MSJ, Aff. Mitchell ¶ 1; Decl. Mitchell ¶ 4.) She also

5    testified that Durward was delinquent on December 1999, January 2000, and May 2000

6    payments by at least seven days. (Decl. Mitchell ¶ 6.) According to accountant Ronald

7    Stein, as of May 31, 2000, Durward's net income was a loss of $916,662. (Decl. Mitchell,

8    Ex. 1.)

9            D. Clark believes that in June 2000, Cornwall directed the shipping broker to redirect

10   funds meant for Durward to Cornwall's personal account. (MSJ, Aff. D. Clark ¶ 22.) At

11   that time, Pentland was owed one to two months of managing fees. (Id.) J. Clark testified

12   that by late June 2000, Durward owed UNTI approximately $846,000. (Supp. MSJ, Aff. J.

13   Clark ¶ 34.) The Clarks discussed Durward in early July 2000 and thereafter J. Clark, with

14   D. Clark's support, caused UNTI to cease funding Durward's business. (MSJ, Aff. D.

15   Clark ¶ 22; Supp. MSJ, Aff. J. Clark ¶ 35.) Beginning in late June 2000, J. Clark directed

16   the transfer of Durward's funds in its bank accounts to UNTI pursuant to their financing

17   arrangement. (Supp. MSJ, Aff. J. Clark ¶ 36.)

18          On July 11, 2000, J. Clark sent Cornwall an email stating Durward no longer would

19   be able to make payments:

20          [P]lease convey the following to the owners of our current cargo
            (Transgrains): That Durward Marine will not be able to make payments
21          to agents for the offload of the present cargo. We feel that it is necessary
            to notify them immediately so they may make any accommodations they
22          feel necessary. Also, please notify Coastal Petroleum, KPI, and Tomis
            West that Durward Marine is not capable . . . of making any payments on
23          monies owed now or in the future.

24          To explain: We have weathered considerable financial loss over the past
            10 months and are not prepared to extend ourselves any further. Tom, I
25          have a feeling that you understand our position. There are a few other
            issues that I will not be covering in this message. Rather, we will
26          communicate them within the next day or so. Please communicate the

                                        7

1  above without delay.

2  (Supp. MSJ, Ex. B-9.) Cornwall responded that he was "shocked" by this communication,

3  that if such financial trouble existed Durward should not have taken on the last charter, and

4  that Pentland resigned as Durward's manager. (Opp'n, Decl. Hohenstein, Ex. 92.)

5  At the time, the Tomis West was under subcharter to Transgrain with cargo on

6  board. (Opp'n, Decl. Walter ¶ 10.) For the type of charters Durward engaged in, the

7  freight was paid for within three days of loading the cargo. (MSJ, Ex. A-1.) J. Clark

8  testified that he understood that the cargo was payable within a few days of loading the

9  cargo. (Opp'n, Decl. Hohenstein, Ex. 7 at 41.) Cornwall testified that Transgrain already

10  had paid Durward in full. (Opp'n, Decl. Hohenstein, Ex. 4 at 117.)

11  On the other hand, Durward was required to pay "hire," or a daily rate paid to the

12  shipowner, one month in advance and was responsible for supply of bunkers (fuel oil).

13  (Opp'n, Decl. Wright ¶¶ 14, 19.) Jones estimated that had Durward completed its voyage, it

14  would have netted $185,793 for that voyage. (Opp'n, Decl. Hohenstein, Ex. 10 at 154-55.)

15  J. Clark understood at the time of his July 11 email that Durward had obligations to pay

16  third parties. (Opp'n, Decl. Hohenstein, Ex. 7 at 254-55.) Even though Durward

17  discontinued paying these fees on July 11, Plaintiff nonetheless had to continue the voyage

18  to deliver the cargo according to a signed bill of lading. (Opp'n, Decl. Walter ¶ 10.) As

19  such, Maritime paid for services provided to the Tomis West by third parties, such as fuel

20  debts, because it was expected to do so as Plaintiff's manager. (MSJ, Ex. E-3 at 3-4.)

21  However, Plaintiff ultimately was responsible for those payments. (Id.)

22  By July 30, 2000, Durward had $4,000. (Supp. MSJ, Aff. J. Clark ¶ 36.) D. Clark

23  estimates that UNTI lost over $500,000 from its dealings with Durward. (MSJ, Aff. D.

24  Clark ¶ 23.) However, UNTI never made a demand of any personal funds of J. Clark

25  pursuant to his personal guarantee. (Opp'n, Decl. Hohenstein, Ex. 3 at 8.) J. Clark testified

26  that as UNTI president the decision to enforce a guarantee was his but that he did not direct

8

1    enforcement of his personal guarantee of Durward. (Opp'n, Decl. Hohenstein, Ex. 7 at 77.)

2    Pursuant to the Charter Agreement, Plaintiff commenced arbitration proceedings

3    against Durward in London in 2001. (Opp'n, Decl. Hohenstein, Ex. 1, Final Arbitration

4    Award at 2.) Durward was served with Plaintiff's claim but failed to respond. (Opp'n,

5    Decl. Hohenstein, Ex. 1, Reasons for Final Arbitration Award at 2.) On April 30, 2002, the

6    arbitrator awarded Plaintiff $682,654.36 plus interest. (Opp'n, Decl. Hohenstein, Ex. 1,

7    Final Arbitration Award at 2-3.) In May and June of 2002, Plaintiff demanded payment

8    from Durward through the Clarks, Jones, and Cornwall to no avail. (Opp'n, Decl.

9    Chatzimichailoglou ¶¶ 13-14, Exs. 5-6.)

10    On October 15, 2002, Plaintiff filed a petition in this Court to confirm the arbitration

11    award. (Compl. (Doc. #1), Ex. 3.) Durward failed to appear or respond. (Compl., Ex. 4 at

12    1.) On December 3, 2002, the Court affirmed the arbitration award and entered judgment in

13    favor of Plaintiff. (Compl., Exs. 4-5.) In 2003 and 2004, efforts to enforce the judgment

14    commenced, including issuing subpoenas to the Clarks, RBC, and UNTI. (Opp'n, Decl.

15    Chatzimichailoglou ¶ 16.) In 2005, Plaintiff's attorneys prepared a draft complaint against

16    Defendants that was transmitted to Defendants in hopes of settlement, which ultimately was

17    unsuccessful. (Id. ¶¶ 18-19.) Plaintiff's counsel thereafter advised that an expert

18    accountant should be hired to analyze a veil piercing claim against Defendants. (Id. ¶ 20.)

19    A forensic accountant was appointed in 2005, produced a preliminary report in January

20    2006, and provided a final report in May 2006. (Id.) In March 2007, Plaintiff filed suit in

21    California but because the judgment was from Nevada, Plaintiff dismissed. (Id. ¶ 21.)

22    Plaintiff brought suit in this Court on August 1, 2007 against UNTI and the Clarks to

23    pierce Durward's corporate veil and enforce the judgment against Defendants. (Compl.)

24    Defendants thereafter moved to dismiss, arguing the suit was untimely under Nevada law

25    and that enforcing the judgment would violate due process because they were not named

26    parties in the arbitration. (Order (Doc. #52) at 3.) The Court held that under maritime law,

9

1    the doctrine of laches governed the timing of this action and that piercing Durward's

2    corporate veil would not violate Defendants' due process rights. (Id. at 5, 8.)  Defendants

3    now move for summary judgment, arguing Plaintiff lacks standing, Defendants are not

4    Durward's alter ego, and Plaintiff's claims are barred by the doctrine of laches.

5    **II.      DISCUSSION**

6             Summary judgment is appropriate "if the pleadings, the discovery and disclosure

7    materials on file, and any affidavits show that there is no genuine issue as to any material

8    fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

9    A fact is "material" if it might affect the outcome of a suit, as determined by the governing

10   substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is

11   "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the

12   non-moving party.  Jespersen v. Harrah's Operating Co., 392 F.3d 1076, 1079 (9th Cir.

13   2004).  Initially, the moving party bears the burden of proving there is no genuine issue of

14   material fact. Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  After the

15   moving party meets its burden, the burden shifts to the non-moving party to produce

16   evidence that a genuine issue of material fact remains for trial. Id. (citing Liberty Lobby,

17   477 U.S. at 248-49).  The Court views all evidence in the light most favorable to the non-

18   moving party.  Id.

19           **A.  Standing**

20           Defendants argue Plaintiff lacks standing because Maritime is funding the litigation

21   to recover funds Maritime paid for the Tomis West to complete its voyage.  Defendants also

22   contend Maritime was authorized to act on Plaintiff's behalf only until 2000.  Plaintiff

23   responds that it suffered an injury in fact because the Charter Agreement was between

24   Plaintiff and Durward.

25           To establish standing under Article III of the United States Constitution, a plaintiff

26   must show "(1) injury in fact; (2) causation; and (3) likelihood that the injury will be

10

1  redressed by a favorable decision." <u>Am. Civil Liberties Union of Nev. v. Lomax</u>, 471 F.3d

2  1010, 1015 (9th Cir. 2006).  A plaintiff's alleged injury in fact must be "to a legally

3  protected interest that is both concrete and particularized and actual and imminent, as

4  opposed to conjectural or hypothetical." <u>LSO, Ltd. v. Stroh</u>, 205 F.3d 1146, 1152-53 (9th

5  Cir. 2000) (quotations omitted).

6      Because the Charter Agreement was between Durward and Plaintiff, not Maritime,

7  Plaintiff suffered an injury in fact when Durward breached that agreement.  Even if

8  Maritime paid fees for which Plaintiff ultimately was responsible, it did so as Plaintiff's

9  manager.  Plaintiff and Maritime's relationship does not preclude Plaintiff from enforcing

10  the London arbitration award received by Plaintiff.  Plaintiff therefore has standing.

11      **B. Alter Ego**

12      Defendants argue Plaintiff cannot establish alter ego because Defendants did not

13  commingle funds with Durward, never held themselves out as being liable for Durward's

14  obligations, and Durward's business was separate from that of Defendants.  Defendants also

15  contend Plaintiff cannot establish injustice because Plaintiff never sought information about

16  Durward's structure or personal guarantees, and inability to collect on a debt does not

17  establish injustice.  Plaintiff responds that its evidence shows alter ego through common

18  ownership, same corporate office, inadequate capitalization, financing of Durward and use

19  of Durward's assets by Defendants, informal loan transactions, joint tax returns, decision

20  making for Durward by Defendants, and fraud and injustice to third parties.

21      A federal court sitting in admiralty[2] may pierce the corporate veil to reach the alter

22  ego of a corporate defendant.  <u>Chan v. Soc'y Expeditions, Inc.</u>, 123 F.3d 1287, 1294 (9th

23  Cir. 1997).  Courts also have applied alter ego principles to limited liability companies.

24  <u>See, e.g.</u>, <u>NetJets Aviation, Inc. v. LHC Commc'ns, LLC</u>, 537 F.3d 168, 178 (2d Cir. 2008)

25

26
_____

    [2] Because the contract at issue here is maritime in nature, it is within the admiralty jurisdiction
of this Court.  <u>P.R. Ports Auth. v. Umpierre-Solares</u>, 456 F.3d 220, 224 (1st Cir. 2006).

1  (considering Delaware law); In re Giampietro, 317 B.R. 841, 847 (Bankr. D. Nev. 2004)

2  (concluding the Nevada Supreme Court would apply alter ego principles to limited liability

3  companies).  Generally, a federal court sitting in admiralty applies federal common law in

4  analyzing corporate identity.  Chan, 123 F.3d at 1294.  "Although the district court can

5  import principles of state law which it finds both persuasive and appropriate to subsume, it

6  is federal common law that controls."  In re Holborn Oil Trading Ltd., 774 F. Supp. 840,

7  844 (S.D.N.Y. 1991) (citation and quotation omitted).

8          "[F]ederal common law allows piercing of the corporate veil where a corporation

9  uses its alter ego to perpetrate a fraud or where it so dominates and disregards its alter ego's

10 corporate form that the alter ego was actually carrying on the controlling corporation's

11 business instead of its own."  Chan, 123 F.3d at 1294.  Further, "[c]orporate separateness is

12 respected unless doing so would work injustice upon an innocent third party."  Id.

13 (quotation omitted); see also Dole v. Unocal Corp., 248 F.3d 915, 926 (9th Cir. 2001)

14 (stating the plaintiff must establish the two companies share "unity of interest and

15 ownership" and "failure to disregard their separate identities would result in a fraud or

16 injustice" (alteration and quotation omitted)); In re Giampietro, 317 B.R. at 851 (stating

17 alter ego under Nevada law requires the alter ego to influence and govern the corporation; a

18 unity of interest so that the alter ego and corporation are inseparable; and adherence to the

19 fiction of a separate entity would sanction fraud or promote injustice).  Plaintiff does not

20 argue that fraud exists.  Thus, alter ego here requires domination and injustice.

21        1.  Domination

22        The "disregard of corporate separateness requires that the controlling corporate

23 entity exercise total domination of the subservient corporation, to the extent that the

24 subservient corporation manifests no separate corporate interests of its own."  Chan, 123

25 F.3d at 1294 (quotation omitted).  Another court considered the following factors as an aid

26 in evaluating domination under federal maritime law:

                                        12

1    (1) disregard of corporate formalities; (2) inadequate capitalization; (3)
     intermingling of funds; (4) overlap in ownership, officers, directors, and
2    personnel; (5) common office space, address and telephone numbers of
     corporate entities; (6) the degree of discretion shown by the allegedly
3    dominated corporation; (7) whether the dealings between the entities are
     at arms length; (8) whether the corporations are treated as independent
4    profit centers; (9) payment or guarantee of the corporation's debts by the
     dominating entity; and (10) intermingling of property between the
5    entities.

6    Budisukma Permai SDN BHD v. N.M.K. Prods. & Agencies Lanka (Private) Ltd., 606 F.

7    Supp. 2d 391, 399 (S.D.N.Y. 2009) (quotation omitted); see also N. Tankers (Cyprus) Ltd.

8    v. Backstrom, 967 F. Supp. 1391, 1402 (D. Conn. 1997) (citing similar factors in another

9    maritime case); Polaris Indus. Corp. v. Kaplan, 747 P.2d 884, 887 (Nev. 1987) ("In

10   determining whether a unity of interest exists between the individual and the corporation,

11   courts have looked to factors like co-mingling of funds, undercapitalization, unauthorized

12   diversion of funds, treatment of corporate assets as the individual's own, and failure to

13   observe corporate formalities.").

14        Such factors are not exhaustive nor is there a minimum number of factors that must

15   be satisfied; instead, "the guiding principle is whether piercing the corporate veil would

16   achieve an equitable result." Budisukma, 606 F. Supp. 2d at 399 (quotation omitted); see

17   also Polaris, 747 P.2d at 887 ("[T]he result depends on the circumstances of each case.").

18   Further, because of the differences between corporations and limited liability companies,

19   these factors may apply with different weight to limited liability companies. In re

20   Giampietro, 317 B.R. at 848 n.10 ("Most limited liability company statutes allow members

21   to manage the LLC. This provision illustrates a legislative intent to allow small, one-person

22   and family-owned businesses the freedom to operate their companies themselves and still

23   enjoy freedom from personal liability.").

24        Here, the evidence suggests disregard of corporate formalities because J. Clark could

25   not recall if Durward had an annual meeting as required by the Durward operating

26   agreement. Nevertheless, because of the nature of Durward as a limited liability company

13

1    with only two members, this perhaps is not surprising and does not necessarily demonstrate

2    alter ego. As for capitalization, the initial capital expenditures were only $12,000 and may

3    not have been made. Viewing the facts in the light most favorable to Plaintiff, this is

4    inadequate compared to an initial start-up cost of $350,000.

5         Although D. Clark testified he did not commingle his personal funds with Durward's

6    funds, the Durward check register notes deposits from D. Clark and his wife. D. Clark also

7    authorized a wire to Durward's account from D. Clark's mother's trust fund. Similarly,

8    Durward funds were used to pay J. Clark's American Express bill. Although these

9    transactions might have been loans, the specific circumstances are unclear. Viewing the

10   facts in the light most favorable to Plaintiff, these acts suggest D. Clark and J. Clark

11   inappropriately commingled their personal funds with Durward's funds and they were

12   paying Durward's debts with their own property.[3]

13        Further, the ownership and management of Durward and UNTI overlaps. D. Clark is

14   the sole owner of UNTI and also was a member of Durward. J. Clark was an officer for

15   both UNTI and Durward. Although overlapping ownership alone is insufficient to find alter

16   ego, other facts related to the ownership scheme suggest alter ego. For example, the Clarks

17   transferred Durward's ownership in part to Burch, who had nothing to do with Durward.

18   No evidence suggests either Burch or Jones compensated the Clarks for the transfer.

19   Additionally, the Clarks incorporated Durward for the purpose of benefitting themselves by

20   the repayment of the Sealock debt. None of Durward's members, including the Clarks,

21   noted a Durward Schedule K-1 on their personal taxes. Defendants and Durward also

22   shared the same office space. Viewing these facts in the light most favorable to Plaintiff,

23   Defendants and Durward were not separate organizations.

24   ///

25

26
     [3] The evidence before the Court does not suggest intermingling of assets other than financial
     assets.

                                              14

1   On the other hand, the formal financing and security agreements between UNTI and

2   Durward suggest arms length dealings.  Similarly, UNTI had numerous clients other than

3   Durward, and UNTI, as a purchase order financing company, and Durward, as a charterer of

4   deep sea vessels, were separate companies with separate profits.  Because Durward's

5   business was chartering vessels, it was in Durward's best interests to complete the Tomis

6   West's final voyage pursuant to the Chartering Agreement to which Durward was a party.

7   However, the Clarks and UNTI chose to act for their own benefit to Durward's detriment

8   when they decided to remove all of Durward's funds, thereby making it impossible for

9   Durward to pay for the completion of the final voyage.  Considering this in the light most

10  favorable to Plaintiff, Durward had limited discretion to complete its own business,

11  particularly the last voyage, because Defendants controlled Durward and its finances for the

12  benefit of Defendants.

13  Additionally, UNTI lost an estimated $500,000 to Durward, but UNTI never made

14  a demand on J. Clark pursuant to his personal guarantee of Durward.  J. Clark also engaged

15  in stock transactions with Durward funds.  Although J. Clark testified he was trying to help

16  Durward with the stock transactions, Durward regularly needed more money, had been late

17  on payments at least three times, and was operating at a loss.  As such, J. Clark's stock

18  losses do not appear to be in Durward's best interests.  Viewing the facts in the light most

19  favorable to Plaintiff, Defendants were not completely separate from Durward and had

20  substantial control over Durward's affairs, thereby prohibiting Durward from freely

21  engaging in its own interests as a charterer of deep sea vessels.  A genuine issue of material

22  fact therefore exists as to domination.

23      2. Injustice

24  The Court must respect corporate separateness unless doing so would work an

25  injustice upon an innocent third party.  "The inability to collect from an insolvent defendant

26  does not, by itself, constitute an inequitable result."  Bd. of Trustees of the Mill Cabinet

15

1   Pension Trust Fund for N. Cal. v. Valley Cabinet & MFG. Co., 877 F.2d 769, 774 (9th Cir.

2   1989) (alterations and quotation omitted).  For instance, in In re Giampetro, the court held

3   that recognizing a debtor and the limited liability company he formed as separate entities

4   would not "sanction a fraud or promote injustice" under Nevada law. 317 B.R. at 844, 851,

5   858.  Considering the creditor's "reasonable expectations" at the time of the parties'

6   agreement, the court determined the creditor treated the limited liability company and the

7   debtor as separate entities and took no steps to ensure the debtor would continue to run the

8   limited liability company. Id. at 857-58.  In effect, the creditor "received exactly what it

9   bargained for." Id. at 858 (alteration and quotation omitted).

10       In contrast, in Lorenz v. Beltio, Ltd., a couple caused a lease for a motel to be

11   transferred to a corporation they formed. Lorenz v. Beltio, Ltd., 963 P.2d 488, 491 (Nev.

12   1998).  After causing the corporation to file bankruptcy, the couple continued to operate the

13   motel for their personal gain, making payments from the corporation to themselves but not

14   to the landlord. Id. at 490, 498.  The Nevada Supreme Court found this to be an injustice

15   justifying alter ego liability. Id. at 497-98.

16       Here, the fact that Plaintiff did not get paid under the Charter Agreement does not by

17   itself constitute an injustice.  As in Giampietro, Plaintiff did not take steps in examining

18   Durward or those individuals and companies running Durward.  Although relying on a

19   broker's and agent's experiences in the maritime industry may have been reasonable,

20   Plaintiff nonetheless failed to examine Durward's financial stability.

21       On the other hand, this case parallels Lorenz in that Defendants drained Durward's

22   funds for their own benefit at the expense of Plaintiff and other third parties who were owed

23   payments.  Jones testified that he estimated Durward would net $185,793 from this voyage.

24   This was not enough to compensate UNTI for all it was owed, but Durward nonetheless had

25   enough money to complete that voyage.  Although UNTI had a valid security interest in

26   Durward's assets, viewing the facts in the light most favorable to Plaintiff, it is unjust to

16

1   exercise that interest shortly after Durward was paid for its final voyage and before

2   Durward paid any fees for which Durward was responsible.  As such, a genuine issue of

3   material fact exists as to injustice.

4        Accordingly, because a genuine issue of material fact exists as to whether

5   Defendants dominated and controlled Durward and whether those actions were unjust, the

6   Court will deny summary judgment as to alter ego.

7   **C. Doctrine of Laches**

8        Defendants argue that Plaintiff unreasonably delayed in bring suit against

9   Defendants, thereby prejudicing Defendants because they had no opportunity to defend in

10  the English arbitration or confirmation of that award.  Plaintiff responds that it did not delay

11  because it conducted discovery to obtain the judgment against Durward and that Defendants

12  were not prejudiced because they knew about the arbitration.

13       The doctrine of laches is the relevant lapse of time standard in maritime law.  King v.

14  Alaska S.S. Co., 431 F.2d 994, 996 (9th Cir. 1970); see also P.R. Ports Auth. v. Umpierre-

15  Solares, 456 F.3d 220, 227 (1st Cir. 2006).  Although the Court may look to analogous

16  federal or state law to establish burdens of proof and presumptions of timeliness, the inquiry

17  is focused on "whether the plaintiff's delay in bring suit was unreasonable and whether

18  defendant was prejudiced by the delay."  P.R. Ports Auth., 456 F.3d at 227 (quotation

19  omitted).  The general rule is that the delay is "measured from the time that the plaintiff

20  knew or should have known about the potential claim at issue."  Kling v. Hallmark Cards,

21  Inc., 225 F.3d 1030, 1036 (9th Cir. 2000).

22       Plaintiff brought the London arbitration soon after Durward breached the Charter

23  Agreement and then had the judgment affirmed in this Court in 2002.  Plaintiff spent 2003

24  and 2004 attempting to enforce the judgment.  After that failed, Plaintiff in 2005 drafted a

25  complaint in an effort to encourage Defendants to settle.  When settlement did not result,

26  Plaintiff hired an expert on alter ego to determine if they had a valid alter ego claim.  After

1 | Plaintiff believed it had such a claim, it brought suit in California and then Nevada in 2007.

2 | Although these events have taken many years, Plaintiff's attempts to recover have been

3 | both continuous and diligent. This is not unreasonable.

4 |      Because Defendants have been aware of the litigation since its inception, they are not

5 | prejudiced by the delay. Defendants claim they are prejudiced because they were not

6 | parties to the original litigation, but they were active in Durward's affairs and could have

7 | participated since the London arbitration. Plaintiff's suit is not prejudicial and the laches

8 | defense therefore fails.

9 | **III. CONCLUSION**

10 |      IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment

11 | (Doc. #70) is hereby DENIED.

12 |      IT IS FURTHER ORDERED that the parties shall file a proposed joint pretrial order

13 | on or before September 3, 2009.

14

15 | DATED: August 3, 2009.

16

17

18 |         PHILIP M. PRO
        United States District Judge

19

20

21

22

23

24

25

26

18

# EXHIBIT 4

IN THE MATTER OF THE ARBITRATION ACT 1996

AND IN THE MATTER OF AN ARBITRATION

BETWEEN:

ERMIS MANAGEMENT COMPANY LIMITED of Valetta
Claimants
(Disponent Owners)

- and -

DURWARD MARINE LLC of the United States of America
Respondents
(Charterers)

"TOMIS WEST"

Charterparty dated London, 9th August 1999

FINAL ARBITRATION AWARD

Whereas:

1.  By a Charterparty on an amended Shelltime 4 form with additional clauses, the
    Claimants (hereinafter referred to as "the Owners") chartered their vessel, the
    "TOMIS WEST" to the Respondents (hereinafter referred to as "the
    Charterers") for a period of a minimum of 3 months from the time of delivery
    with options for two further periods each of 3 months, the second of which
    was amended by an addendum dated 22nd December 1999 to an option for 6
    months, which option was subsequently exercised by the Charterers.

1

2. Clause 41 of the charter provided that the charter should be construed and relations between the parties determined in accordance with the laws of England. It further provided that any disputes shall be decided by the English Courts but that either party might have the right to have any dispute referred to arbitration in London before a single arbitrator.

3. Disputes as more detailed hereinafter having arisen, the Owners exercised their right to have these determined in arbitration and the parties having failed to agree on a single arbitrator, the Owners applied to the English High Court that I, the undersigned John Schofield of 10 Sutherland Avenue, Petts Wood, Orpington, Kent BR5 1QZ be appointed as sole arbitrator and by an order dated 15th June 2001, the court so ordered. The seat of the arbitration is England.

4. In this Reference, the Owners claim damages in a total sum of USD 682,654.36, together with compound interest and costs following the Charterers repudiation of the charter. Although I am satisfied that the Charterers had every opportunity to contest the Owners' claims for the reasons set out more fully in the accompanying document, the Charterers failed to respond to the Owners' claims.

5. Written submissions and supporting documents were put before me by the Owners' Defence Club but the Charterers chose to make no submissions.

NOW I, the said JOHN SCHOFIELD having considered the written submissions and supporting documents put before me, DO HEREBY MAKE, ISSUE AND PUBLISH this my FINAL ARBITRATION AWARD as follows for the reasons set out in the accompanying document which is integral to and forms part of this AWARD.

A. I find that on or about 12th July 2000, the Charterers evinced an intention to repudiate the charter, which repudiation was accepted by the Owners by a telex dated 13th July 2000 and that on that date the charter came to an end. I further find that the Owners are entitled to damages in the sum claimed of USD 682,654.36.

B. I THEREFORE AWARD AND ADJUDGE that the Charterers shall forthwith pay to the Owners, the sum of USD 682,654.36 (United States Dollars Six Hundred and Eighty Two Thousand Six Hundred and Fifty Four and Thirty Six Cents) together with compound interest thereon with three monthly rests at a rate of 6.25% from 1st August 2000 until the date of the award and thereafter at a rate of 4% until payment.

C. I FURTHER AWARD AND ADJUDGE that the Charterers shall bear their own costs in the Reference, together with the legal costs of the Owners, the latter if not agreed, to be determined by me, I reserving my jurisdiction as necessary and that the Charterers shall also pay for the cost of the award in the sum of £1,500.00, PROVIDED ALWAYS

2

that if this shall have been paid in the first instance by the Owners, they shall be entitled to an immediate reimbursement of the monies so paid, together with compound interest with three monthly rests at a rate of 6% from the date of payment until the date of reimbursement.

Given under my hand, this 30th day of April 2002.


John Schofield                    Witness

# EXHIBIT 5

ORIGINAL

1  Todd L. Bice, No. 4534
   SCHRECK BRIGNONE
2  300 South Fourth Street, Suite 1200
   Las Vegas, NV 89101
3  (702) 382-2101

4  James H. Hohenstein (JH-3285)
   Haight Gardner Holland & Knight
5  A Law Office of Holland & Knight LLP
   195 Broadway
6  New York, NY 10007
   (212) 513-3200

7

8  Attorneys for Petitioner
   ERMIS MANAGEMENT COMPANY LIMITED

9

10                 UNITED STATES DISTRICT COURT

11                       DISTRICT OF NEVADA

12  IN THE MATTER OF THE          )   CASE NO. CV-S-02-1359-KJD-LRL
    ARBITRATION                   )
13                                )
       - between -                )
14                                )
    ERMIS MANAGEMENT COMPANY      )   ORDER
15  LIMITED,                      )   [Proposed]
                                  )
16                    Petitioner, )   ┌──────────────────────────┐
                                  )   │    ENTERED AND           │
17     - and -                    )   │      SERVED              │
                                  )   │                          │
18  DURWARD MARINE LLC,           )   │       - 5 2002           │
                                  )   │                          │
19                    Respondent. )   │  CLERK, U.S. DISTRICT COURT│
                                  )   │  DISTRICT OF NEVADA      │
20  ─────────────────────────────)   │  BY              DEPUTY  │
                                      └──────────────────────────┘

21       This matter comes before the Court by the Petition of Ermis Management Company

22  Limited ("Ermis"). Ermis seeks to confirm an arbitration award rendered in its favor against

23  Durward Marine LLC ("Durward"), a Nevada business entity.

24       Having reviewed the pleadings submitted in this case, and taking cognizance of the

25  fact that Durward has not appeared nor responded to the Petition, the Court will now rule.

26       I find that this Court has jurisdiction in this case under 9 U.S.C. §203, given that the

27  arbitration award here arises from a non-domestic commercial transaction. Further, as this

28  action involves a charter party, jurisdiction also lies under 28 U.S.C. §1333 and 9 U.S.C.

    §§1 and 9. The Court further notes that as the United Kingdom is a party to the Convention

SCHRECK BRIGNONE
300 South Fourth Street
Suite 1200
Las Vegas, Nevada 89101
(702) 382-2101

10

1   on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") (21

2   U.S.T. 2566, *reprinted* at notes following 9 U.S.C.A. §201), this action may proceed.

3   Additionally, I find that venue is proper here under 9 U.S.C. §204, as Respondent is a

4   Nevada business organization.

5       Having determined these threshold issues, the Court now turns to the question of the

6   confirmation of the award.  This issue is governed by 9 U.S.C. §207, which states:

7           Within three years after an arbitral award falling under the
            Convention is made, any party to the arbitration may apply to
8           any court having jurisdiction under this chapter for an order
            confirming the award as against any other party to the
9           arbitration. The court shall confirm the award unless it finds one
            of the grounds for refusal or deferral of recognition or
10          enforcement of the award specified in the said Convention.

11  Given the terms of the statute, it is necessary to refer to the appropriate article of the

12  Convention, i.e., Article V:

13          1. Recognition and enforcement of the award may be refused,
            at the request of the party against whom it is invoked, only if
14          that party furnishes to the competent authority where the
            recognition and enforcement is sought, proof that:
15
            (a)  The parties to the agreement referred to in article II were,
16          under the law applicable to them, under some incapacity, or
            the said agreement is not valid under the law to which the
17          parties have subjected it or, failing any indication thereon,
            under the law of the country where the award was made; or
18
            (b)  The party against whom the award is invoked was not
19          given proper notice of the appointment of the arbitrator or of
            the arbitration proceedings or was otherwise unable to present
20          his case; or

21          (c)  The award deals with a difference not contemplated by or
            not falling within  the terms of the submission to arbitration,
22          or it contains decisions on matters beyond the scope of the
            submission to arbitration, provided that, if the decisions on
23          matters submitted to arbitration can be separated from those
            not so submitted, that part of the award which contains
24          decisions on matters submitted to arbitration may be
            recognized and enforced; or
25
            (d)  The composition of the arbitral authority or the arbitral
26          procedure was not in accordance with the agreement of the
            parties, or, failing such agreement, was not in accordance with
27          the law of the country where the arbitration took place; or

28

SCHRECK BRIGNONE
300 South Fourth Street
Suite 1200
Las Vegas, Nevada 89101
(702) 382-2101

- 2 -

1    (e)  The award has not yet become binding on the parties, or
has been set aside or suspended by a competent authority of
2    the country in which, or under the law of which, that award
was made.

3
2.  Recognition and enforcement of an arbitral award may also
4    be refused if the competent authority in the country where
recognition and enforcement is sought finds that:

5
(a)  The subject matter of the difference is not capable of
6    settlement by arbitration under the law of that country; or

7    (b)  The recognition or enforcement of the award would be
contrary to the public policy of that country.

8
Under Article V(1), it is incumbent on the party resisting confirmation to submit proof of
9
one of the specified grounds in order to prevent confirmation.  Here Durward, by not
10
appearing, has obviously waived any right to do so.  Further, having reviewed the arbitration
11
award itself, the Court is satisfied that due process was allowed to Durward in the arbitration
12
proceedings.  Finally, this arbitration award arises from a routine commercial transaction and
13
is certainly not against the public policy of the United States and thus there is no basis under
14
Article V(2) for refusing confirmation.
15
The Court notes that Petitioner seeks attorneys' fees and disbursements related to this
16
action.  As the underlying contract is governed by English law, such fees and disbursements
17
are recoverable.  *De Roburt v. Gannet Co. Inc.*, 558 F.Supp. 1223, 1228 (D. Hawaii 1983),
18
*rev'd on other grounds*, 733 F.2d 701 (9th Cir. 1984), *cert. denied*, 469 U.S. 1159 (1985).
19
Moreover, the Court's decision is also warranted given Durward's abject refusal to
20
participate in the arbitration proceeding and this action.
21

22

23

24

25

26

27

28

- 3 -

1    Based on the foregoing, the arbitration award is confirmed in all respects and the

2  Petitioner is entitled to recover its attorneys' fees related to these proceedings.  Judgment

3  will be entered in Petitioner's favor accordingly.

4

5                                                        IT IS SO ORDERED.

6    3 Dec 02
   _____                          _____
7    Date                                        United States District Court Judge

8  Submitted By:

9  SCHRECK BRIGNONE

10

11  Todd L. Bice, No. 4534
   300 South Fourth Street, Suite 1200
12  Las Vegas, NV 89101
   (702) 382-2101
13  Attorneys for Petitioner

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    - 4 -

# EXHIBIT 6

ORIGINAL

RECEIVED
IN __ __ BOX

NOV __ __ __ __ '02

U.S. DI__ __ __ __ COURT
DISTRI__ __ __ __ NEVADA

DEC 3 4 17 PM '02

BY __ __

1  Todd L. Bice, No. 4534
   SCHRECK BRIGNONE
2  300 South Fourth Street, Suite 1200
   Las Vegas, NV 89101
3  (702) 382-2101

4  James H. Hohenstein (JH 3285)
   Haight Gardner Holland & Knight
5  A Law Office of Holland & Knight LLP
   195 Broadway
6  New York, NY 10007
   (212) 513-3200
7
   Attorneys for Petitioner
8  ERMIS MANAGEMENT COMPANY LIMITED

9
                    UNITED STATES DISTRICT COURT
10
                        DISTRICT OF NEVADA
11

12  IN THE MATTER OF THE          )    CASE NO. CV-S-02-1359-KJD-LRL
    ARBITRATION                   )
13                                )
         - between -             )
14                                )
    ERMIS MANAGEMENT COMPANY      )    **JUDGMENT**
15  LIMITED,                      )    [Proposed]
                                  )
16               Petitioner,      )    ┌─────────────────────┐
                                  )    │   **ENTERED AND**   │
17       - and -                  )    │     **SERVED**      │
                                  )    │                     │
18  DURWARD MARINE LLC,           )    │      - 5 2002       │
                                  )    │                     │
19               Respondent.      )    │ CLERK, U.S. DISTRICT COURT │
                                  )    │  DISTRICT OF NEVADA │
20  ────────────────────────────  )    │ BY _____ DEPUTY │
                                       └─────────────────────┘

21       Petitioner, Ermis Management Company Limited ("Ermis"), having petitioned this

22  Court pursuant to 9 U.S.C. §§ 207 and 9, for an Order confirming the arbitration award

23  rendered on April 30, 2002 against Durward Marine LLC ("Durward"), and noting Durward

24  has not appeared nor responded within the time allowed, and considering all the material

25  submitted by Ermis, and for the reasons set forth in this Court's Order dated ~~November~~ December 3,

26  2002, the Court having confirmed the arbitration award, it is

27       ORDERED that the arbitration award dated April 30, 2002 in favor of Petitioner

28  Ermis and against Respondent Durward is confirmed; and it is further

SCHRECK BRIGNONE
300 South Fourth Street
Suite 1200
Las Vegas, Nevada 89101
(702) 382-2101

/1

1    ORDERED that judgment is granted in favor of Ermis and against Durward in the

2    terms and amounts set forth in the arbitration award including:

3    a.    Principal: $682,654.36;

4    b.    Interest through April 30, 2002: $78,257.80;

5    c.    Interest (May 1, 2002 through November 22, 2002): $15,323.00;

6    d.    Arbitrator's Fee: $2,236.50;

7    e.    Interest on Arbitrator's Fee (June 18, 2002 to November 22, 2002): $57.79;

8    and it is further

9    ORDERED that Respondent pay Petitioners' costs and expenses, including attorneys'

10   fees, incurred in bringing this petition, which are in the amount of $5,696.65; and it is

11   further

12   ORDERED that the amounts set forth herein, which total $784,226.10, are due and

13   payable to Petitioner as of the date of this Order; and it is further

14   ORDERED that Respondent pay Petitioner post-judgment interest in accordance with

15   28 U.S.C. §1961.

16                          IT IS SO ORDERED.

17

18   03 Dec 02
     Date                              United States District Court Judge

19

20   Submitted By:

     SCHRECK BRIGNONE
21

22

     Todd L. Bice, No. 4534
23   300 South Fourth Street, Suite 1200
     Las Vegas, NV 89101
24   (702) 382-2101
     Attorneys for Petitioner
25

26

27

28

                          - 2 -

SCHRECK BRIGNONE
300 South Fourth Street
Suite 1200
Las Vegas, Nevada 89101
(702) 382-2101